**Billie Austin BRYANT, Plaintiff,**

v.

**Norman A. CARLSON et al., Defendants.**

**Civ. No. 79–187.**

United States District Court,
M. D. Pennsylvania.

Nov. 27, 1979.

On Renewed Motion For Summary
Judgment Feb. 22, 1980.

Billie Austin Bryant (pro se).

Joseph F. Cimini, Asst. U. S. Atty., Scranton, Pa., for defendants.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

### I. FACTS

Presently before the Court is a civil action seeking mandamus relief under 28 U.S.C. § 1361. The plaintiff, an inmate at the Lewisburg federal penitentiary,[1] is challenging his special administrative rating. On April 24, 1978, Bryant received a Bureau of Prisons ("Bureau") memorandum notifying him that he tentatively had been designated a "Central Monitoring Case" ("C.M.C."), because there was evidence that he might be endangered if incarcerated "with certain other offenders or in certain geographical areas." The plaintiff was informed that in the event this classification became finalized, approval of the Bureau's Central Office in Washington would be required before he could be transferred to another facility or participate in "community activities." The C.M.C. rating was adopted formally on the following August 7. The notice stated, "For your mutual protection you are to be separated from another inmate in federal custody." Bryant appealed this action to the Bureau's General Counsel. On September 28, the classification was affirmed with the following statement offered as the sole rationale:

"Confidential information indicates you must be separated from this other inmate for your mutual protection."[2]

Bryant asserts that the events leading to his C.M.C. rating constituted a denial of due process for several reasons. First, he contends that he has never received a sufficient explanation of the reasons for his designation. Second, the prisoner argues that he did not have a hearing in which he could contest the decision. Finally, the plaintiff states that the notice the Bureau gave him was inadequate. The main remedy that Bryant seeks is a court order expunging his C.M.C. classification.

The defendants, conversely, have moved for dismissal of the case or, in the alternative, for summary judgment. The government presents a concise argument. The challenged rating was issued under the Bureau's Policy Statement Number 7900.53A.[3] According to the defendants, this regulation is fully constitutional[4] and its procedures were followed in the selection of the plaintiff's C.M.C. status. Therefore, the government concludes that "Bryant's instant civil action must fail." To assess this claim properly, it is first necessary to review the provisions of the challenged policy.

### II. THE HISTORY AND PROVISIONS OF 7900.53A

The Bureau regularly designated certain inmates for special Central Office monitor-

---

1. Bryant has been imprisoned since 1968. He is serving the following sentences consecutively: (1) two life terms for murder, (2) one fifty-four year period for bank robbery, and (3) one twenty-year state sentence for robbery with a deadly weapon. He will not be eligible for parole until September 23, 2017.

2. The various memoranda involved in Bryant's C.M.C. designation and subsequent appeal are appended to Document 1 of the Record.

3. It should be noted that there are some suggestions in the record that Bryant actually was treated under Policy Statement Number 5190.1, an updated version of 7900.53A. For the purpose of deciding this motion, the Court has proceeded on the assumption that the latter is the proper provision to consider largely because the defendants' brief indicates that the two sets of regulations are virtually identical. As noted in Part V of this Memorandum, however, the defendants must expand the record.

In so doing, they must either provide the Court with a copy of 5190.1 or with assurances that the plaintiff's C.M.C. rating was processed under 7900.53A.

4. The government cites two cases from the Middle District of Pennsylvania in which the validity of 7900.53, an earlier version substantially similar to 7900.53A, was upheld. *United States ex rel. Addonizio v. Arnold*, 423 F.Supp. 189, 192 (M.D.Pa.1976); *United States ex rel. Durso v. Fenton*, Civil No. 76–1381 (M.D.Pa., filed January 14, 1977), *aff'd*, No. 77–1672 (3d Cir., filed January 11, 1978). The defendants also note that in *Raia v. Arnold*, 405 F.Supp. 766 (M.D.Pa.1975), *vacated and remanded*, 539 F.2d 704 (3d Cir. 1976) the Third Circuit remanded a case to this Court with directions "to order respondent to process petitioner under the provisions of Policy Statement 7900.53."

ing long before regulations governing the practice were ever issued. The apparent reason for this action was a belief that the prisoners "stamped" for this treatment had special problems which required careful consideration before important administrative decisions could be made. On April 30, 1974, the Bureau enacted Policy Statement Number 7900.47, the first set of comprehensive rules in this area. A convict could merit "special offender" status by falling into one of eight categories. Such a label required that the Central Office grant special approval before the prisoner could be transferred or furloughed. Parole also might have been affected adversely in some cases.[5] Significantly, the inmate had no opportunity to contest this classification.[6]

The original policy, however, soon underwent rigorous judicial review. The Second Circuit, for example, declared that the regulations amounted to a denial of due process, because the prisoners named to the list of special offenders were subjected to a "grievous loss" without an adequate hearing. *Cardaropoli v. Norton*, 523 F.2d at 994–99; *Catalano v. United States*, 383 F.Supp. at 351–53. Furthermore, in *Raia v. Arnold*, 405 F.Supp. at 770, this Court also declared 7900.47 unconstitutional.[7] On April 7, 1976, the Bureau announced a new policy designed to accommodate judicial review by "providing some basic procedures to support a factual determination that an inmate falls into a category of offenders which must be carefully monitored." Bureau Operations Memorandum 7900.52 at 1. Bryant attacks the constitutionality of

these regulations which are contained in 7900.53 and its successor, 7900.53A.

In promulgating 7900.53, the Bureau explicitly stated that "specific procedures are delineated to assure that inmates are informed of a Central Monitoring Case designation and given an opportunity to provide additional information to be considered." Operations Memorandum Number 7900.52 at 1. Two basic reforms of the prior classification rules were made. First, the number of categories into which a C.M.C. inmate could fall was decreased.[8] Second, procedures were established which were supposed to give the prisoner a fair opportunity to contest his or her classification. Bryant was treated under 7900.53A which provides the following safeguards:

(a) The warden or his designee shall advise the inmate in writing as promptly as possible of his tentative designation and the basis for it. The notice of the basis may be limited in the interest of security or safety. For example, in protection cases under Category A, [e. g., Bryant], notice should not ordinarily include the names of those other inmates in need of protection. On the other hand, in sophisticated criminal involvement cases under Category B(3), adequate notice should include specific reference to the sophisticated criminal involvement, that is, the crime for which the inmate was convicted or explicit evidence of other sophisticated criminal activity.

(b) The warden or his designee shall give the inmate an opportunity to respond and object to the designation if he desires to

---

**5.** Those categories were: (1) non-federal offenders, (2) prisoners with special prior records, (3) protection cases, (4) extreme custody risks, (5) subversives, (6) cases of notoriety, (7) threats against high government officials, and (8) an "other" group designated at the warden's discretion. Most "special offenders" had organized crime connections. White, *Special Offender-Central Monitoring Case*, 3 Ohio N.U. L.R. 658, 658–60 (1977). On the matter of parole, see *Cardaropoli v. Norton*, 523 F.2d 990, 994 (2d Cir. 1975).

**6.** *See Catalano v. United States*, 383 F.Supp. 346, 348–50 (D.Conn.1974). *See also* The Bureau's Operation Memorandum Number 7900.-

52, which was issued simultaneously with 7900.53.

**7.** There was some precedent upholding the "special offender" procedure. *Marchesani v. McCune*, 531 F.2d 459 (10th Cir. 1976).

**8.** Under 7900.53 and 7900.53A, these groupings are prisoners who (A) require separation from certain geographical areas and other prisoners, (B) need close supervision due to their "offense, criminal record, institutional behavior or notoriety" (factors include: disruptive activities, threats to government officials, unusual publicity), and (C) are state offenders in federal prisons or federal convicts in state facilities.

do so. His response may be made orally to the person designated by the warden to supervise this program. The inmate, at his option, may also submit written information. If the inmate indicates that information must be obtained from outside the institution, he may be given a reasonable time (ordinarily not to exceed 30 days) to provide it.

(c) The warden or his designee shall forward to the Central Office complete information *regarding the Central Monitoring Case designation, including a summary of the inmate's objections and a copy of all written material submitted by the inmate under (b) above.* When an institution makes a tentative designation, a copy of the inmate's completed Form BP–5.1 (Sentence Data Summary) and a copy of the institution's written notification to him is forwarded to the Central Office. On the reverse of the BP–5.1 *and attachments if necessary*, the institution is *to clearly and thoroughly* report the reasons for the designation, utilizing the format in Attachment A. Care should be taken to provide the Central Office with *all information that might be pertinent to determine if a Central Monitoring Case designation is valid and to make future decisions about the case. Justification for the designation must also be readily available in the inmate's institutional file.*

(d) The Central Office makes a final decision based on this record and notifies the institution and the inmate of the final decision in writing. The inmate is also advised that he may appeal the final decision to the General Counsel's Office, Bureau of Prisons, through the Administrative Remedy Procedure.

(e) When, due to an error in the procedures or substance of the designation, an inmate is ordered to be removed from Central Monitoring designation, all references to the designation in the inmate's file shall be removed. This will require preparation of a new central file folder, transferring papers from the old file to the new, and removal of the top sheets, showing the CMC designation, from the top of the first section of the central file and from the top of the left-hand side of the commitment file.

In addition, all references to the designation in reports, copies of correspondence, or any other file material must be removed in such a way that any person reviewing the file material will not be able to ascertain that such a designation was ever made. This will ordinarily require the rewriting of reports which reference the designation or destroying materials, containing such a reference, which are no longer needed. [emphasis in original]

Several preliminary issues must be determined before the constitutionality of Bryant's treatment can be assessed. Initially, the Court has to decide if the plaintiff's C.M.C. designation implicates a liberty interest which entitles him to protection under the Due Process Clause. If so, two other questions will require consideration. The Court first will have to determine if 7900.53A affords an inmate a fair hearing to dispute his rating. Furthermore, even if 7900.53A is declared constitutionally valid on its face, the Court will still have to inquire whether it was sufficient as applied.[9]

### III. EXISTENCE OF A LIBERTY INTEREST

 The holdings which struck down 7900.47 did so on the basis of a theory which the Supreme Court has since rejected. As has been noted, *Cardaropoli, Catalano*, and *Raia* concluded that designation as a special offender subjected the inmate to a "grievous loss" sufficient to require the safeguard of due process. Yet the majority in *Meachum v. Fano*, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976) declared through Justice White, "We reject at the outset the notion that *any* grievous loss visited upon a person by the state is suffi-

---

**9.** The Supreme Court has recognized that it is possible for an otherwise valid "provision to be applied so as to deprive a [litigant] of a proper hearing in specific situations . . . ." *Lindsey v. Normet*, 405 U.S. 56, 65, 92 S.Ct. 862, 870, 31 L.Ed.2d 36 (1972).

cient to invoke the procedural protections of the Due Process Clause. . . . the determining factor is the nature of the interest involved rather than its weight." [emphasis in original] An analysis of *Meachum* indicates that the Supreme Court considers legal limitation of governmental discretion in prison administration to be the essence of a "liberty interest." Official action is to be immune from the strictures of due process unless the challenging litigant is able to point to some rule having the force of state or federal law which restricts the ability of government to act in certain ways. In cases where such a restraint can be found, parties affected by the questioned activity are entitled to a hearing sufficient to prevent officials from transgressing the bounds of their lawful discretion. In other instances, the concept of procedural due process simply has no application.[10]

*Moody v. Daggett,* 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976) expanded the *Meachum* rationale. The facts actually concerned the right of a federal inmate incarcerated for a crime committed on parole to demand a prompt hearing when a violator warrant is lodged at his prison but not officially served. In a footnote, nevertheless, the *Moody* opinion observed:

> . . . In *Meachum v. Fano,* . . . no due process protections were required upon the discretionary transfer of state prisoners to a substantially less agreeable prison, even where that transfer visited a 'grievous loss' upon the inmate. *The same is true of prisoner classification and eligibility for rehabilitative programs in the federal system. Congress has given federal prison officials full discretion to control these conditions of confinement, 18 U.S.C. § 4081, and petitioner has no legitimate statutory or constitutional entitlement sufficient to invoke due process.*

*Id.* at 88 n.9, 97 S.Ct. at 279 n.9. [emphasis added]

Superficially, the *Moody* footnote appears to undermine entirely any claim that the C.M.C. rating triggers the Due Process Clause. Indeed, this single passage convinced the Seventh Circuit to abandon its pro-*Cardaropoli* position and rule that a prisoner had no liberty interest at stake when the Bureau considered his classification as a special offender. *Solomon v. Benson,* 563 F.2d 339, 341–43 (7th Cir. 1977). Several district courts, moreover, concurred. *Smaldone v. United States,* 458 F.Supp. 1000, 1006–07 (D.Kansas 1978); *Durso v. Rowe,* 430 F.Supp. 49, 52 (N.D.Ill., 1977), *rev'd,* 579 F.2d 1365 (7th Cir. 1978), *cert. denied,* 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979); *Mayo v. Sigler,* 428 F.Supp. 1343, 1349–50 (N.D.Ga.1977).

Other cases have reached a different interpretation. In *Meachum,* the Supreme Court recognized that the states[11] could create liberty interests "by statute, by rule or regulation, or by interpretation of their own constitutions." 427 U.S. at 229, 96 S.Ct. at 2540. Citing this concept, several circuits have held that limits on official discretion imposed by federal agency regulations may satisfy the Supreme Court's test for entitlement to due process protection. *Drayton v. McCall,* 584 F.2d 1208 (2d Cir. 1978), for example, involved a federal prisoner's attempt to reverse the rescission of his parole. The government argued that under the *Meachum* test the prisoner had no substantial liberty interest. The Second Circuit, nonetheless, noted that the Parole Commission had issued detailed regulations limiting such rescission to certain narrowly defined instances. This fact, the court explained, distinguished *Meachum* and *Moody,*

---

10. *Id.* at 223–29, 96 S.Ct. at 2537–40. *See also Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 2104–06, 60 L.Ed.2d 668 (1979); *Montayne v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976).

11. Since *Meachum* was a case brought by state convicts, it only considered liberty interests caused by the federal constitution and by state law. This analysis, however, was not meant to imply that federal statutes or regulations could not implicate the right to due process. Thus, in considering whether or not regulations may create substantial liberty interests, the fact that they may be promulgated by federal or state agencies is irrelevant as long as these policies are valid.

both of which concerned challenges to policies in which prison administrators enjoyed unfettered discretion. According to the *Drayton* opinion, "The regulatory structure, therefore, justifies the parole grantee's expectation of future liberty under the Supreme Court's recent rather formalistic emphasis on governmentally established entitlements." *Id.* at 1215. [footnotes omitted]

The Sixth Circuit adopted this line of reasoning in *Walker v. Hughes*, 558 F.2d 1247 (6th Cir. 1977), which also found that federal regulations could "trigger" the Due Process Clause. That case involved prison disciplinary procedures. The court admitted that the relevant statutory law gave prison authorities absolute discretion in the area under scrutiny. *Id.* at 1252–53. Examination of the Bureau's policies, however, convinced the Sixth Circuit that these rules sufficiently abridged that discretion to create liberty interests protected by the Fifth Amendment. *Id.* at 1252–56. This conclusion was not deterred by the *Moody* footnote which *Walker* explicitly cited. *Id.* at 1253.

Indeed, such logic has undermined the Seventh Circuit's decision in *Solomon* that designation as a special offender or, presumably, a C.M.C. case carries no due process implications. *Durso v. Rowe*, 579 F.2d 1365 (7th Cir. 1978), *cert. denied*, 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979) considered a state prisoner's constitutional right to challenge termination of his participation in a work release program. The court unanimously recognized that "the predicate necessary to trigger the Due Process Clause is not restricted to statutorily-created rights; it may also be found in official policies or practices." *Id.* at 1369. Even more importantly, *Arsberry v. Sielaff*, 586 F.2d 37, 46–47 (7th Cir. 1978) explicitly adopted the Sixth Circuit's holding contained in *Walker* and announced that "any

limitations *Solomon* may have placed upon the scope of sources of state law entitlement have been taken from the board by the rationale and holding in *Durso v. Rowe* . . . ."

▮▮▮ The instant case surely falls within the logic of *Drayton*, *Walker*, and *Durso*, as well as *Meachum*. Bryant was classified an "A" under 7900.53A at 2. The regulation clearly limits this status to:

A. Inmates who require protection and separation because they may be in danger if confined in certain geographical areas or in the same facility with certain other inmates; likewise, the inmates from whom such protection cases are to be separated. Also, other inmates who require special supervision for their own or others' protection.

Bureau officials have no right under the regulation to give such a rating to inmates without these characteristics. The *Moody* footnote, which concerned an issue tangential to the main case and did not address the concept of liberty interests created by agency policies, does not control the instant action. To hold that passage dispositive would require this Court to reject the subsequent rulings of three circuits and to ignore the plain statement in *Meachum* that official regulations may be the source of a liberty interest. Such a result is unacceptable. Therefore, the Court must agree with Judge Burns' conclusion in *Pugliese v. Nelson*, 472 F.Supp. 992, 996 (D.Conn.1979) that an inmate deserves the benefit of the Due Process Clause before the Bureau may select him or her for C.M.C. treatment.[12]

## IV. THE TYPE OF DUE PROCESS DESERVED

Once it is determined that due process applies, the question remains what process is due. *Morrissey v. Brewer*, 408 U.S. 471,

---

12. The *Pugliese* prisoner was given a C.M.C. rating of B–3, *i. e.*, a convict who has received "unusual publicity" due to some facet of his crime, arrest, trial, or prisoner status. The Court recognizes that this distinguishing factor might be very significant to the outcome of this case. Yet this difference, which could influence the type of process which is due to Bryant, has no bearing on his overall liberty interest created by 7900.53A. *See* Parts IV and V of the Memorandum for more discussion.

481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). This decision, moreover, is a judicial prerogative, because another branch of government cannot create a liberty interest and then establish procedures relevant to it which are immune from judicial review. *Walker v. Hughes*, 558 F.2d at 1254. Policy Statement Number 7900.53A, therefore, must be scrutinized carefully.

Several cases have discussed the validity of the regulation under the Fifth Amendment. None of these precedents, however, can be considered binding authority. In *Polizzi v. Sigler*, 564 F.2d 792, 798–99 (8th Cir. 1977), for example, the Eighth Circuit refused to declare 7900.53A's predecessor, 7900.53, unconstitutional. The court, however, explained its ruling by stating that since the regulations were new, it would be "premature" to hold adversely before the Bureau had had "an opportunity to implement its policy." The *Polizzi* decision emphasized that it did not prejudice "any posthearing claim by appellees that the procedures specified in the policy statement may have been inadequate to protect their constitutional rights to procedural due process." *Id.* at 799.

The defendants in the instant case place heavy reliance on several cases previously rendered in this district. As has been noted,[13] the Court of Appeals for the Third Circuit remanded the *Raia* case to this Court with instructions to order application of 7900.53. That order, however, contained no specific endorsement of the policy's constitutionality. The regulations in question had only been promulgated during the interim between the district and appellate rulings in *Raia*. Furthermore, the Court of Appeals specifically stated that this Court was to retain jurisdiction of the case. No

indication was given that the prisoner would be barred from raising objections to the constitutionality of 7900.53 after it had been applied and the Court had an opportunity to assess its sufficiency under the Due Process Clause. Thus, *Raia* cannot be considered a precedent upholding the policy any more than can *Polizzi.*

Likewise, because of the shift in analysis heretofore mentioned, the Court is not prepared to adopt *United States ex rel. Addonizio v. Arnold*, 423 F.Supp. at 192 or *United States ex rel. Durso v. Fenton, supra*, as dispositive in this case.[14] Recently, the Supreme Court has adopted a three-step test to be followed in determination of the type of due process appropriate to a given situation. *Addonizio* and *Durso* were decided without application of this analysis. Therefore, an independent examination must be taken of the issue.[15]

In *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976), Justice Powell explained on behalf of the majority that the "specific dictates of due process" generally can be derived by weighing three factors: (1) the private interest affected by the official action, (2) the risk that an improper deprivation will result under present procedures and the probable value of additional or substitute safeguards, and (3) the government's interest in maintaining the *status quo* and the additional fiscal or administrative burdens that would result from such a change. The Supreme Court has reaffirmed this test on a significant number of occasions. *Parham v. J. R.*, 442 U.S. 584, 99 S.Ct. 2493, 2502–03, 61 L.Ed.2d 101 (1979); *Dixon v. Love*, 431 U.S. 105, 97 S.Ct. 1723, 1727, 52 L.Ed.2d 172 (1977); *Smith v. O.F.F.E.R.*,

---

13. *See* n.4, *supra*.

14. The defendant makes much of the fact that *Durso* was affirmed by the Third Circuit without opinion. An examination of the relevant order indicates that the district court had dismissed the case for failure to exhaust administrative remedies. On appeal, the *Durso* prisoner had to address this issue as well as the merits. The Third Circuit's order gives no indication that the Court of Appeals reached the

due process question. The affirmance, therefore, is not binding.

15. This same reason makes it inappropriate at this point to adopt the remedies ordered in *Pugliese, supra*, or *Coppola v. United States Attorney General*, 455 F.Supp. 15 (D.Conn. 1977). These cases prescribed procedural protections beyond those provided by the Bureau without examining recent Supreme Court mandates.

431 U.S. 816, 848–849, 97 S.Ct. 2094, 2112, 53 L.Ed.2d 14 (1977). Unfortunately, the record in the instant case is too sparse for this Court to apply the *Mathews* formula. Accordingly, the defendants' motions for dismissal and summary judgment shall be denied. Both parties, moreover, shall be ordered to provide additional information necessary for the Court to dispose of this case properly.

## V. QUESTIONS REQUIRING ANSWERS

■ The plaintiff must answer several questions which concern his interest at stake in the case. In his appeal of the C.M.C. rating to the Bureau's General Counsel, Bryant listed two adverse effects that the designation allegedly would have on his situation. First, he claimed that his ability to obtain furloughs and emergency trips would be impaired. The plaintiff must explain why he expects such a result. Second, the prisoner objected that the rating would lessen his chances to take part in "community activities." It should be noted, however, that 7900.53A at 6 clearly states that an "A," such as the plaintiff, does not need Central Office permission to enter programs within the "institution's local community." Thus, only Bryant's enrollment in community activities beyond the neighborhood of the prison in which he happens to be incarcerated could be infringed. The prisoner is ordered to state what these programs might be. Furthermore, Bryant is invited to make any further arguments as to how his personal interest may be influenced in other ways.

The defendants are ordered to address four additional matters important to resolution of this litigation. Initially, they must discuss the possible consequences of the inmate's classification. Some courts have stated that "special offender" or C.M.C. status may detrimentally influence the opportunity to take part in a wide variety of institutional activities, such as furloughs,

transfers, halfway house placement, community programs, or even parole. *See Cardaropoli v. Norton*, 523 F.2d at 993–95; *Pugliese v. Norton*, 472 F.Supp. at 996; *Raia v. Arnold*, 405 F.Supp. at 768. The government must inform the Court if the validity of these findings is to be conceded.

The Court, moreover, is concerned that the only reason the plaintiff was ever given for his C.M.C. rating was a statement informing him that an anonymous person had reported that an unnamed inmate posed a threat to Bryant's safety. While it is certainly true that prison officials have an interest in maintaining secrecy with regard to many security matters, this factor must be balanced with the prisoner's due process rights. It is difficult to determine how an inmate could rebut so ambiguous a charge no matter what type of hearing he received. Therefore, the defendants must inform the Court how they justify this type of explanation. In so doing, the government should address the holdings in *Pugliese v. Nelson*, 472 F.Supp. at 996–98 and *Coppola v. United States Attorney General*, 455 F.Supp. at 20 [16] as well as the existence or non-existence of less restrictive methods (e. g., maintaining secrecy of the informant's identity but not that of the allegedly dangerous inmate). Specificity shall be required as to this answer.

Next, the defendants must describe the government's interest in maintaining the procedures presently contained in 7900.53A and explain how these safeguards are adequate to protect a prisoner's interest in avoiding an improper C.M.C. classification. This information is essential for the Court to apply the second and third steps of the *Mathews* test. It should be noted that *Cardaropoli, Pugliese,* and other cases ordered that prisoners receive procedural safeguards in excess of those granted under 7900.53A. The defendants must state the reasons behind the government's desire to continue with the present standards.

---

**16.** *Pugliese* and *Coppola* considered the type of notice that a prisoner deserves in a C.M.C. classification question; both held that an inmate deserves much more than was afforded in the instant case.

Finally, the Court notes that there is a sharp discrepancy between the affidavit offered by Bryant and that of the prison authorities concerning the actual facts involved in the plaintiff's classification. According to R. B. Sinsheimer, Case Management Coordinator at Lewisburg, the plaintiff essentially waived his right to present evidence contradicting the propriety of his "A" rating. *See* Document 8 of the Record. Bryant, on the other hand, insists that when he confronted Sinsheimer on the matter, the Coordinator stated that the issue was settled and the prisoner had no option other than to appeal to the Bureau. *See* Document 13 of the Record. Obviously, the plaintiff is attempting to convince the Court that Sinsheimer's conduct denied the inmate a fair opportunity to present his arguments on the subject. The defendants must inform the Court if they feel that Bryant can be declared to have received due process even if the charges in his affidavit are taken as true. As has been stated, the mere fact that 7900.53A may be facially valid will not dispose of this case. The Court still must decide if the actual application of the policy preserved the prisoner's due process rights. This fourth answer will be needed for such an inquiry.[17]

## ORDER

And now, this 27th day of November 1979, the defendants' motion for dismissal or, in the alternative, summary judgment is denied. And further, it is ordered that the parties expand the record as explained in the accompanying Memorandum. Both the plaintiff and defendants shall have twenty (20) days in which to comply with this order. An additional five (5) days shall be permitted for the filing of replies.

**17.** The government is reminded that it also must satisfy the requirement contained in n.3, *supra.*

**1.** This designation shall be referred to as "Category A" or "separation status."

**2.** The defendants have cited the recent opinion in *Makris v. United States Bureau of Prisons*, 606 F.2d 575 (5th Cir. 1979) to support their contention that constitutional rights are not implicated in C.M.C. classification. That

## MEMORANDUM AND ORDER

### On Renewed Motion For Summary Judgment

Bryant, a prisoner at the Lewisburg federal penitentiary, has filed this mandamus action seeking expungement of his Central Monitoring Case ("C.M.C.") classification. According to the Bureau of Prisons ("Bureau"), the inmate's safety would be threatened by incarceration "with certain other offenders or in certain geographical areas."[1] The plaintiff maintains that this label was affixed in an unconstitutional manner. On November 27, 1979, this court decided that such a categorization implicates a tangible liberty interest and cannot be effected until a prisoner has been afforded due process. An expansion of the Record was ordered to facilitate a ruling on the type of hearing the inmate deserved.

The Government has implicitly requested the court to reverse its holding that C.M.C. status generally "triggers" the Due Process clause.[2] This invitation shall be declined. A review of the briefs and affidavits recently submitted by the parties, however, clearly indicates that on the peculiar facts of this situation, Bryant could not have suffered material prejudice from the "A" rating even if it is assumed that the application was erroneous. The Due Process Clause, therefore, is not relevant to this particular case. For that reason, the defendants' renewed motion for summary judgment shall be granted.

## I. INTERESTS AFFECTED BY THE CMC DESIGNATION

█ The plaintiff theorizes that he has five separate interests at stake in this liti-

precedent is unpersuasive for two reasons. First, it placed heavy reliance on *Moody v. Daggett*, 429 U.S. 78, 88 n.9, 97 S.Ct. 274, 279 n.9, 50 L.Ed.2d 236 (1976) and *Solomon v. Benson*, 563 F.2d 339 (7th Cir. 1977). This court's Memorandum dated November 27, 1979 has already explained at length why these cases are not controlling. Second, *Makris* did not consider the possibility that federal regulations might create a liberty interest.

gation. He insists, for example, that the C.M.C. classification has subjected him to invidious discrimination. In support of this contention, the inmate notes that he was denied participation in the Lewisburg Arts and Crafts program as well as an opportunity to work overtime on Saturdays. Yet the bald assertion that these decisions were based on Bryant's C.M.C. status has no support in the Record.[3] Category "A", moreover, merely requires that a prisoner be separated from one or more other convicts, and it has no relevance to the named employment and recreational privileges. Thus, the claim of intra-institutional discrimination will be rejected.

■ Second, the plaintiff argues that his C.M.C. designation may have adverse consequences for parole opportunities. Such might be the case in Category "B" situations where convicts are said to require close supervision due to the nature of their "offense, criminal record, institutional behavior or notoriety." See Paragraph 3(B) of Exhibit 4 attached to Document 18 of the Record. The pejorative connotations of such a rating could conceivably impair the prospects for an early release. Cf. Cardaropoli v. Norton, 523 F.2d 990, 994 (2d Cir. 1975). See 28 C.F.R. § 2.19 (1979). This conclusion, however, seems totally unjustified in the context of separation status which does not concern the inmate's character or criminal propensity.[4]

■ A third interest asserted by Bryant centers on his ability to obtain furlough privileges. In theory, Category "A" places some constraints on these opportunities, because the Bureau presumably will not authorize a temporary release which might place the inmate in the same locale as the person or persons from whom he or she is to be separated. Under this rationale, a prisoner generally eligible for furlough consideration might have a valid argument if he or she could show that the classification is erroneous. A review of the facts in this case, nevertheless, demonstrates that the plaintiff has nothing at stake. Bryant's record includes four major convictions.[5] He will be incarcerated for at least another thirty-seven years. The federal authorities have assigned him to Lewisburg, one of the most secure penal facilities in the nation. Bureau regulations set forth definite qualifications which a prisoner must have to be considered for a temporary release.[6] A review of these requirements makes it clear that this particular inmate's chances for furlough are essentially non-existent. Accordingly, the argument that the Category "A" label has impaired such opportunities is frivolous.

■ Fourth, the prisoner states that separation status precludes his transfer to a Community Treatment Center ("C.T.C."). In reality, Bryant's hope for residence in such a facility will be illusory until well into the next century. C.T.C. programs are designed to help inmates acclimate themselves to life outside of prison. Assignment to these facilities is confined to the last days of a prisoner's institutionalization. The average length of time spent in a C.T.C. is 120 days; an assignment for over six months is strictly limited to individuals who can demonstrate both "sufficient stability" and a "very special need, . . . such as unusual opportunities for schooling, training or employment." It is unclear if Bryant will ever be paroled. At this point in time, nonetheless, his interest in C.T.C. participa-

---

**3.** "Conclusory statements, general denials, and factual allegations not based on personal knowledge would be insufficient to avoid summary judgment." *Olympic Junior, Inc. v. David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir. 1972).

**4.** Furthermore, since Bryant will not even be eligible for parole until 2017, it is likely that his Category A classification will have lapsed before his case is considered.

**5.** As indicated by the court's November 27, 1979 Memorandum, the plaintiff has two convictions for murder, one for bank robbery, and one for robbery with a deadly weapon. He has been imprisoned since 1968.

**6.** *See* Bureau of Prisons Policy Statement 5280.1, Exhibit 6 appended to Document 18 of the Record.

tion is too negligible to provide a basis for due process protection.[7]

A final contention involves the possibility of transfer to another institution. Bryant maintains that classification as a separation case adversely affects his chances to be sent to a penitentiary with a more favorable environment. There is some suggestion that he hopes to be assigned to a minimum-security prison with extensive work and study release programs.[8] This argument would have some validity if it were offered by a prisoner with prospects of transfer to a different type of institution. In such a situation, an inmate could contend that improper Category "A" status might deny access to a desirable facility merely because another person resides there when, in fact, the latter's proximity creates no security risk. The Government's uncontradicted affidavits, however, demonstrate that Bryant's criminal and penitentiary records do not qualify him for a minimum-security institution.[9] After a full opportunity to explain his perceived interests at stake, the plaintiff has given the court no reason to conclude that any transfer he might receive would be to anything other than another maximum-security facility. The prisoner has not indicated any way in which his interests are injured by placement in Lewisburg as opposed to one of the other federal prisons in its class.

## II. LEGAL ANALYSIS

This court has noted that the essence of due process is "protection of the individual against arbitrary and capricious governmental action." *Conklin v. Fenton*, Civil No. 78–508, slip op. at 7 (M.D.Pa., filed September 28, 1979). Many cases have recognized that under the proper circumstances state and federal regulations may create liberty interests which entitle designated persons to the safeguards of due process. *Meachum v. Fano*, 427 U.S. at 229, 96 S.Ct. at 2540; *Drayton v. McCall*, 584 F.2d 1208, 1215 (2d Cir. 1978); *Durso v. Rowe*, 579 F.2d 1365, 1369 (7th Cir.), *cert. denied*, 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979); *Walker v. Hughes*, 558 F.2d 1247, 1252–56 (6th Cir. 1977); *Pugliese v. Nelson*, 472 F.Supp. 992, 996 (D.Conn.1979). The crux of such holdings is the conclusion that officials who ignore binding rules of law act in an arbitrary and capricious manner. These precedents, nevertheless, have not held that the Due Process Clause automatically incorporates all prison regulations into the United States Constitution.

*Conklin v. Fenton*, Civil No. 78–508, involved a suit brought by a Lewisburg inmate challenging his placement in administrative segregation. The plaintiff's special confinement clearly transgressed the applicable federal regulations. This court, nonetheless, concluded that consideration must be given to the "severity of the deprivation" alleged as well as to the existence of any "justifiable expectation" that such custody would "only be imposed for closely circumscribed reasons." Upon review of all the facts, especially the brevity of the inmate's actual stay in segregation, it was concluded "that the 'degree of liberty at

---

**7.** *See* Bureau of Prisons Operation Memorandum 200–79 (7300) (August 22, 1979) which updates Program Statement 7022.1 (old number 7300.13F).

**8.** *See* Document 17 of the Record at 3. It should be noted that *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) does not control this issue. The latter case held that a prisoner has no argument under the Due Process Clause to challenge transfer to another institution unless a statutory or other independent legal right exists to resist the move. The court is not questioning the exist-

ence of such a right. The Memorandum dated November 27, 1979 has already ruled that the Bureau's rules can trigger the protections of due process. Rather, the question under consideration is whether violation of the regulations could harm Bryant in any way. *Meachum* did not deny that "life in one prison [may be] much more disagreeable than in another." *Id.* at 224, 96 S.Ct. at 2538.

**9.** "Mr. Bryant is neither minimum [n]or community custody." *See* the Affidavit of David R. Essig attached to Document 18 of the Record.

**1088**

stake' was insufficient to require due process protection." *Id.* at 11–13.[10]

The soundness of *Conklin* is evident in light of rulings issued by the Supreme Court. *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972) explained that due process applies only if the government action under attack is likely to cause the complainant to suffer a "grievous loss." *Meachum v. Fano*, 427 U.S. at 224–25, 96 S.Ct. at 2538 carried this analysis a step further by requiring that the challenging litigant also demonstrate an independent "liberty interest" based on state or federal law. *Conklin* merely affirms the two-tiered nature of the *Morrissey-Meachum* rationale by demanding that the plaintiff show both a liberty interest and a grievous loss.

The Due Process Clause does not grant federal courts jurisdiction to render advisory opinions on the validity of official actions. Intervention is inappropriate unless a constitutional violation has occurred. In the instant case, Bryant has not suffered a "grievous" deprivation. Indeed, he has not suffered any tangible loss at all. The plaintiff's constitutional rights, therefore, were not violated even if the Category "A" rating was incorrect.[11] Accordingly, the Government's motion for summary judgment will be granted.

---

10. *Compare Conklin* with *Murphy v. Fenton*, 464 F.Supp. 53, 58 (M.D.Pa.1978) where this court held that prolonged confinement in segregation triggered the Due Process Clause when such custody violated the Bureau's regulations. *See also Wolff v. McDonnell*, 418 U.S. 539, 594, 94 S.Ct. 2963, 2993, 41 L.Ed.2d 935 (1974) (Douglas, J., dissenting) ("Of course, a hearing need not be held before a prisoner is subjected to some minor deprivation, such as an evening's loss of television privileges.").

11. The court does not choose to speculate as to what percentage of C.M.C. prisoners have a sufficient interest at stake to merit due process safeguards. Each case must turn on its own facts as well as the type of classification assigned.