Lawrence D. **CHRISTY** and Kim E. Niehoff, Plaintiffs,

v.

Robert J. **HAMMEL** et al., Respondents.

Civ. No. 79–201.

United States District Court, M. D. Pennsylvania.

June 13, 1980.

O. Randolph Bragg, Northern Pa. Legal Services, Inc., Ira Mark Goldberg, Scranton, Pa., Jeffrey J. Wander, Northern Pa. Legal Services, Inc., Honesdale, Pa., for plaintiffs.

Mary Ellen Krober, Pennsylvania Dept. of Justice, Norman J. Watkins, Edward G. Biester, Harrisburg, Pa., for respondents.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

### I. INTRODUCTION

Plaintiff Lawrence D. Christy is a former inmate of Farview State Hospital, a maximum-security institution located in Wayne County, Pennsylvania. He bases his cause of action on 42 U.S.C. § 1983 and 28 U.S.C. § 1343. The complaint avers that several

Farview guards handcuffed the plaintiff during an evening in November 1978 and moved him from ward AAII, the second-most privileged section of the hospital, to maximum security ("CCI").[1] This special disciplinary incarceration allegedly lasted six days. Christy charges that he was subjected to the following conditions during his stay at CCI: (1) denial of exercise and recreation, (2) unsanitary living quarters,[2] (3) loss of wages, (4) headaches, and (5) weight loss. Furthermore, the plaintiff asserts that upon his release from maximum security he was assigned to Ward AAI, the third-most preferable subdivision at Farview.

Christy maintains that the defendants violated his Fourteenth Amendment right to due process, because they afforded him neither written notice of the reasons for the move nor a hearing with regard to its propriety. Monetary and injunctive remedies are sought.[3] A number of motions are presently pending.

On behalf of the defendants, the Commonwealth has requested that the court either abstain from deciding the underlying constitutional issues or dismiss the suit for failure to state a claim upon which relief can be granted. The plaintiff, conversely, has moved for certification of the case as a class action and an order permitting Kim E. Niehoff, a current resident of Farview, to intervene in the litigation. Upon review of the various arguments presented by the parties, the court will deny the Commonwealth's dispositive motion and order the class certification on the injunction issue. Niehoff, moreover, shall be allowed to intervene.

## II. ABSTENTION

As a general rule, federal courts should refrain from deciding constitutional issues "which might be mooted or presented in a different posture by state court determination of pertinent state law." *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976); *Railroad Commission of Texas v. Pullman Company*, 312 U.S. 496, 498–502, 61 S.Ct. 643, 644–646, 85 L.Ed. 971 (1941).[4] The defendants argue that this principle applies to the instant case. A psychiatric patient's legal rights in Pennsylvania are codified in the Mental Health Procedures Act ("MHPA"), 50 P.S. §§ 7101, et seq. According to the Commonwealth, the state judiciary might interpret the latter statute to guarantee the very procedural protections that Christy claims under the Due Process Clause. Such an interpretation, of course, could eliminate the need to confront the constitutional theory by providing full relief under Pennsylvania law. On this basis, the defendants ask that the court stay its hand until the state judiciary has had an opportunity to construe the MHPA.[5]

---

1. Defendant Myers allegedly directed the transfer while acting under the orders of defendant Wenger. The role of former Superintendent Hammel will be discussed in Part IV of this Memorandum. Based on the oral argument of counsel, it seems the move was supposedly triggered by the defendants' belief that the plaintiff had participated in the beating of another patient.

2. According to the complaint, the walls and food passageway of the plaintiff's "cell" were contaminated with dried food and human waste.

3. To a large extent, the plaintiff would have the court apply the procedural safeguards of *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) to the mental hospital environment. Christy seeks a permanent injunction preventing CCI transfers and "other disciplinary measures" until the inmate in question has been "provided with written notice of the alleged misconduct and proposed disciplinary measures" and "afforded the opportunity to present his or her defense before an impartial panel consisting of at least three (3) persons." Christy also seeks a number of reforms that concern general conditions at Farview.

4. The doctrine has received the name "*Pullman* abstention" after the first major case to apply it.

5. Abstention would be appropriate in the event that the Commonwealth's construction of the statute is correct. *Frederick L. v. Thomas*, 578 F.2d 513, 516–17 (3d Cir. 1978) ("*Frederick II*"); *Frederick L. v. Thomas*, 557 F.2d 373, 383 (3d Cir. 1977) ("*Frederick I*").

The standards for applying the abstention doctrine are delineated in the following passage of *D'Iorio v. County of Delaware*, 592 F.2d 681, 686 (3d Cir. 1978):

. . . First, there must be uncertain issues of state law underlying the federal constitutional claims brought in the federal court. Second, these state law issues must be amenable to an interpretation by the state courts that would obviate the need for or substantially narrow the scope of the adjudication of the constitutional claims. And third, it must appear that an erroneous decision of state law by the federal court would be disruptive of important state policies. . . .

It is necessary to determine whether these criteria call for abstention in the instant case.

The first *D'Iorio* standard involves the degree of uncertainty in the state issue. Abstention should occur in the instant case only if there exists a real possibility that the MHPA will be interpreted to require the procedural safeguards sought by Christy. If the statute clearly is not susceptible to such a construction, there is no reason to believe that resort to the *Pullman* rule would evade the constitutional issue. In that event, abstention would be precluded. *Wisconsin v. Constantineau*, 400 U.S. 433, 438, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971); *Harman v. Forssenius*, 380 U.S. 528, 534–37, 85 S.Ct. 1177, 1181–1183, 14 L.Ed.2d

---

6. Case law is unclear as to just how ambiguous the state law question must be in order for the application of *Pullman* to be mandatory. *Weber v. School District of Philadelphia*, 465 F.Supp. 1371, 1376 (E.D.Pa.1976). Indeed, in our circuit the matter has been relegated to the sound discretion of the district courts with reversals ordered only when that discretion is abused. *D'Iorio v. County of Delaware*, 592 F.2d at 686; *Frederick II*, 578 F.2d at 517; *Frederick I*, 557 F.2d at 383. This flexibility is proper. Abstention, after all, is an equitable doctrine which is imposed after consideration of various factors, including fairness to the parties. *Bellotti v. Baird*, 428 U.S. 132, 143 n. 10, 96 S.Ct. 2857, 2864, 49 L.Ed.2d 844 (1976). In deciding whether or not to apply the principle, the court must view the situation in its totality.

7. According to 50 P.S. § 7306:

50 (1965). *See* Field, *Abstention in Constitutional Cases: The Scope of the Pullman Abstention Doctrine*, 122 U.Pa.L.Rev. 1071, 1088–89 (1974).[6] Therefore, initial consideration must turn to the MHPA itself.

According to the Supreme Court of Pennsylvania, the Act resulted from "an enlightened legislative endeavor to strike a balance between the state's valid interest in imposing and providing mental health treatment and the individual patient's rights." *In re Gross*, 476 Pa. 203, 212, 382 A.2d 116, 121 (1978). The Act governs many aspects of voluntary and involuntary care. Nothing in the statute, however, specifically regulates the disciplining of inmates assigned to facilities such as Farview. The Commonwealth implicitly concedes this fact. The defendants, nevertheless, contend that several sections of the MHPA may be expanded through judicial interpretation to vest involuntary patients with the protections Christy claims. After a careful review of these provisions, the court must disagree.

Section 7306 of the Act[7] concerns the transfer of an inmate to an "approved facility." The provision guarantees the right to a hearing whenever such a move "will constitute a greater restraint" on the patient. The defendants maintain that the principle might be extended to situations such as Christy's move to maximum security. Close examination of the MHPA undermines this assertion.

(a) Subject to the provisions of subsections (b) and (c), persons in involuntary treatment pursuant to this act may be transferred to any approved facility.

(b) In the absence of an emergency, persons committed pursuant to § 304(g)(2) may not be transferred unless written notice is given to the committing judge and the district attorney in the committing county and no objection is noted from either within 20 days of receipt of said notice. If the court or the district attorney objects to said transfer a hearing shall be held by the court within 20 days to review the commitment order. A decision shall be rendered within 48 hours after the close of evidence.

(c) Whenever such transfer will constitute a greater restraint, it shall not take place unless, upon hearing, a judge or mental health review officer finds it to be necessary and appropriate. [footnote omitted]

The scope of § 7306 is clearly limited to a type of transfer quite different from that presently at issue. To qualify for consideration under the provision, a person must be moved to an "approved facility." The latter term "means any mental health establishment, hospital, clinic, institution, center, day care center, base service unit, community health center, or part thereof, that provides for diagnosis, treatment, care or rehabilitation of mentally ill persons, whether as out patients or in patients." 50 P.S. § 7103. According to the complaint,[8] however, CCI is a place of punishment, not treatment. If the plaintiff's allegations are correct, the move from AAII to CCI neither had nor was designed to have therapeutic value. Christy's action, therefore, assumes that the maximum security ward is not a "facility" under the MHPA. No support exists for the conclusion that the courts of Pennsylvania might extend § 7306 to the plaintiff's grievance.

Second, the Commonwealth notes that 50 P.S. § 7107 grants each Farview resident the right to an "individualized treatment plan" which "to the extent possible, must receive the 'consent of the person in treatment.'"[9] The Supreme Court of Pennsylvania has recognized that the latter section may permit involuntary patients to veto proposed courses of treatment." *Id.* at 214 n. 12, 382 A.2d at 122 n. 12. The defendants assert that this provision may grant Christy an alternative source of relief, presumably by giving him some kind of right to refuse CCI transfer. Unfortunately for the Commonwealth, the argument again runs afoul of the fact that this case centers on the issue of discipline and not treatment as such.

The MHPA defines "treatment" as assistance "administered to alleviate a person's pain and distress and to maximize the probability of his recovery from mental illness." The term includes "diagnosis, evaluation, therapy, or rehabilitation" as well as "care and other services." 50 P.S. § 7104. As previously noted, the plaintiff's complaint rests on the proposition that his incarceration in CCI had nothing to do with the interests furthered by § 7107. *Gross* suggests that Farview inmates may be able to refuse *treatment*, not *discipline*. The court can conceive of no reason that would justify extension of this veto power to the field of punishment.[10]

Lastly, the Commonwealth points to 50 P.S. § 7102 which sets forth the general policy of the MHPA. This provision contains the ·following sentence: "Treatment on a voluntary basis shall be preferred to involuntary treatment; and *in every case, the least restrictions consistent with adequate treatment shall be employed*." (emphasis added) According to the defendants, the latter declaration could be interpreted to require the procedures desired by the plaintiff. For that reason, they theorize that the section is sound basis for abstention. This proposed construction of the statute is strained.

The Pennsylvania Supreme Court has already interpreted the "least restrictions" language of § 7102. In *Appeal of Niccoli*, 472 Pa. 389, 398, 372 A.2d 749, 754 (1977), the majority explained that the statement expresses "a clear legislative intent not merely to sanction but to encourage necessary psychiatric care and treatment on a voluntary basis to the extent

---

**8.** In resolving this motion, the court must accept as true all allegations in the complaint. *See Hochman v. Board of Education of City of Newark*, 534 F.2d 1094, 1097 n. 1 (3d Cir. 1976).

**9.** Section 7107 states:
   Individualized treatment plan means a plan of treatment formulated for a particular person in a program appropriate to his specific needs. To the extent possible, the plan shall

be made with the cooperation, understanding and consent of the person in treatment, and shall impose the least restrictive alternative consistent with affording the person adequate treatment for his condition.

**10.** Indeed, such a conclusion would be absurd. If involuntary patients were permitted to nullify the measures taken to discipline them, the result would probably create havoc in all institutions such as Farview.

feasible." [11] Section 7102, like the other provisions heretofore cited by the Commonwealth, bears no relevance to the type of punishment that may be administered for violations of institutional rules. Nothing in *Niccoli* supports the defendants' belief that the "least restrictions" language may apply to discipline. Furthermore, the defendants have not presented an argument based purely on state grounds that would support such a result.[12] Therefore, no reasonable interpretation of the statute is likely to avoid or modify the due process issue. Abstention is inappropriate. *Procunier v. Martinez*, 416 U.S. 396, 404, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974); *Harman v. Forssenius*, 380 U.S. at 535–37, 85 S.Ct. at 1182–83.

■ Since the supposedly relevant state law is not ambiguous, the court may not apply the *Pullman* doctrine. *Wisconsin v. Constantineau*, 400 U.S. at 438, 91 S.Ct. at 510; *D'Iorio v. County of Delaware*, 592 F.2d at 686. Yet the instant case would not call for abstention even if there were a degree of uncertainty in the meaning of the MHPA. As previously explained, the *Pullman* rule forbids a federal district court to stay its hand until all the relevant equities of the situation have been weighed. *Bellotti v. Baird*, 428 U.S. at 143 n. 10, 96 S.Ct. at 2864; *D'Iorio v. County of Delaware*, 592 F.2d at 685–86; *Frederick II*, 578 F.2d at 517; *Frederick I*, 557 F.2d at 383–84. The present suit involves several factors which indicate that an adjudication of the merits is in order.

■ Initially, since Christy's claim is a civil rights action, it is "one of the least likely candidates for abstention." *Canton v. Spokane School District # 81*, 498 F.2d 840, 846 (9th Cir. 1974); *Wright v. McMann*, 387 F.2d 519, 525 (2d Cir. 1967). As our Court of Appeals stated in *Conover v. Montemuro*, 477 F.2d 1073, 1079–80 (3d Cir. 1973), *aff'd in part and vacated in part on other grounds*, 477 F.2d 1093 (3d Cir. 1973) (*en banc*):

Weighed against the undesirability of a premature decision of the federal issue is the mandate from Congress in the Civil Rights Act passed pursuant to the fourteenth amendment that federal courts will afford a prompt remedy for violations of that amendment and that such remedy includes federal fact finding. [footnote omitted]

*See also McNeese v. Board of Education*, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963).

■ A second consideration which discourages abstention is the delay that would likely result from enforcement of the *Pullman* rule. The plaintiff filed the instant action on February 15, 1979. As the record demonstrates, more than a year was needed to complete the discovery and briefing necessary for the motions to ripen. Furthermore, as the proposed Niehoff intervention indicates, the turnover in the inmate population is such that the litigation may be complicated by a continuing mootness problem unless the court renders a prompt decision on class certification. In short, the inconveniences and inordinate extension of litigation that would result from abstention would be substantial. These circumstances support the court's decision to proceed to the merits. *Harman v. Forssenius*, 380 U.S. at 537, 85 S.Ct. at 1183; *D'Iorio v. County of Delaware*, 592 F.2d at 691 n. 18.

The last of the factors to be considered is the third *D'Iorio* standard, *viz.*, whether "an erroneous decision of state law by the federal court would be disruptive of important state policies." It has already been explained that in resolving this case the court will not be interpreting any facets of state law. Rather, consideration will center on the Fourteenth Amendment. As shall be detailed in Part III of this Memorandum, the proper result of the constitutional ques-

---

**11.** Footnote omitted, emphasis added.

**12.** At oral argument, there was some discussion as to whether or not § 7102 might be the source of a valid liberty interest that would trigger the Due Process Clause and thus support the plaintiff's constitutional claim. *Niccoli*, which indicates that the "least restrictions language" is irrelevant to the issue of discipline, necessitates a negative conclusion.

tion is clear. Furthermore, even if the court eventually does decide to implement procedures to protect Farview inmates during the discipline process, these safeguards may only be designed after due consideration has been given to Pennsylvania's interests in preventing improper interference with its mental health program. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Therefore, the disruption feared by *D'Iorio* is unlikely. Under these circumstances, a district court should not abstain. *McKnight v. Southeastern Pennsylvania Transportation Authority*, 583 F.2d 1229, 1241–42 (3d Cir. 1978).

### III. EXISTENCE OF A LIBERTY INTEREST

In seeking to dismiss the complaint on the merits, the Commonwealth argues that the move to CCI did not involve the right to due process, because Christy was not deprived of "liberty" as defined by the Constitution. Determination of this theory requires close analysis of two important Supreme Court precedents. In *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), several Massachusetts prisoners attacked the validity of their transfer to a maximum security prison without the benefit of antecedent adversarial hearings. The plaintiffs in that case maintained that the move to an institution with conditions significantly worse than those they originally enjoyed constituted a "grievous loss" which entitled them to the protections of due process. The Supreme Court disagreed.

On behalf of the majority, Justice White declared, ". . . we cannot agree that *any* change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the protections of the due process clause." *Id.* at 224, 96 S.Ct. at 2538.[13] To qualify for Fourteenth Amendment safeguards, the prisoners were obligated to demonstrate that either the United States Constitution or state law granted them some basis on which to resist the transfer. If the plaintiffs had made such a showing, then they would have the right to the type of hearing sufficient to protect the entitlement. *See Wolff v. McDonnell*, 418 U.S. at 558–72, 94 S.Ct. at 2975–82.[14] The *Meachum* majority, however, held that neither state nor federal jurisprudence permitted the prisoners the right to remain in their original place of incarceration. Rather, they could be transferred at the discretion of the prison authorities. Thus, the inmates had no right to a pre-transfer hearing, because there was no "liberty interest" which needed protection.

The Commonwealth's motion to dismiss places heavy reliance on *Meachum*. The defendants contend that Christy had no basis in state or federal law to refuse the move to CCI. On this rationale, they insist that the instant plaintiff has no "liberty interest" at stake in the present litigation and, therefore, does not come within the scope of procedural rights offered by the Due Process Clause. *See Bryant v. Carlson*, 489 F.Supp. 1075, 1080–82 (M.D.Pa.1979). Recently, the Supreme Court has elaborated on this rationale.

*Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) involved a Nebraska inmate's challenge to his transfer from prison to a mental hospital. As in *Meachum*, the parties litigated the existence of a "liberty interest" sufficient to trigger the shield of due process. The Supreme Court, again speaking through Justice White, recognized two such sources of constitutional protection. The first flowed from a Nebraska state law which forbade incarceration in a mental hospital until a medical certification of need for such treatment had been issued. Yet more significantly, Justice White explained that even in the absence of such a statute, "the transfer

---

**13.** Footnote omitted.

**14.** The exact type of hearing would depend on the nature of the right at issue, the likelihood that the right could be protected by the proce- dures sought by the plaintiffs, and the state's interest in opposing the adoption of those procedures. *Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903.

of a prisoner from a prison to a mental hospital must be accompanied by appropriate procedural protections." *Id.*, 100 S.Ct. at 1263. The reconciliation of *Meachum* and *Vitek* on this point is very important to resolution of the instant motion.

In the former case, the liberty interest asserted by the plaintiffs had ceased to exist. Once the prisoners had been validly convicted and sentenced, the state automatically had the power to confine them in any institution within its penal system. For this reason, the inmates' right to question their place of custody had been "extinguished." *Meachum v. Fano*, 427 U.S. at 224, 96 S.Ct. at 2538. The *Vitek* situation differed greatly. There, the plaintiff asserted a liberty interest which retained full vitality; namely, freedom from involuntary mental treatment. It is true that, like his counterparts in *Meachum*, the prisoner had been lawfully convicted of a crime. That fact, nevertheless, did not enable the state to incarcerate him in a mental hospital. The *Vitek* plaintiff's right to resist transfer to such an institution had not been "extinguished." On the contrary, it had not been impaired in the slightest degree. As Justice White explained:

> . . . None of our decisions holds that conviction for a crime entitles a State not only to confine the convicted person but also to determine that he has a mental illness and to subject him involuntarily to institutional care in a mental hospital. Such consequences visited on the prisoner are qualitatively different from the punishment characteristically suffered by a person convicted of crime. Our cases recognize as much and reflect

an understanding that involuntary commitment to a mental hospital is not within the range of conditions of confinement to which a prison sentence subjects an individual.

*Vitek v. Jones*, 100 S.Ct. at 1264. Thus, once it was determined that the inmate had suffered "the kind of deprivations of liberty that require procedural protections," [15] the majority ordered relief. *Vitek v. Jones*, 100 S.Ct. at 1263–64. The *Vitek* opinion then went on to prescribe definite procedures that must be taken before such a transfer would be permitted. *Id.* at 1264–65.

This court must place these authorities in the proper perspective in order to resolve the validity of Christy's cause of action. The analysis is two-tiered. First, it is necessary to decide if the plaintiff's right to challenge his placement in CCI has been "extinguished." If so, then the complaint fails to state a valid claim. *Meachum v. Fano*, 427 U.S. at 223–25, 96 S.Ct. at 2537–39. Yet in the event that his right remains viable, the court must next determine if the inmate's grievances are serious enough to involve "the kind of deprivations of liberty that require procedural protections." [16] In Christy's situation, both findings are clear.

■■ *Meachum* extinction has not occurred. Without a doubt, the plaintiff's valid commitment to Farview legitimately curtailed the general scope of his liberty. Christy's freedom of movement for example, lessened substantially. His ability to refuse treatment prescribed by the authorities may have decreased.[17] The inmate's commitment, nonetheless, did not vest the defendants with the prerogative to discipline him at will. On the contrary, the

---

**15.** This conclusion was based on the fact that custody in a mental hospital entailed both a substantial social stigma and a requirement that the plaintiff undergo behavioral modification.

**16.** Prior to *Meachum*, analysis focused on whether the plaintiff had suffered a sufficiently "grievous loss" to justify due process. *Meachum* of course, held that not "*any* grievous loss" would suffice; the complainant also had to demonstrate a "liberty interest." 427 U.S. at 223 24, 96 S.Ct. at 2537 38. No case, however, has ever said that due process attaches *without* the grievous loss. That conclusion

would thrust judicial review into many areas where such extraordinary relief would not be justified. Indeed, even before *Vitek*, this court held that the Due Process Clause is not triggered until the plaintiff has demonstrated *both* a "liberty interest" *and* a "grievous loss." *Bryant v. Carlson*, 489 F.Supp. at 1088 (M.D. Pa., filed February 22, 1979). *See also Conklin v. Fenton*, 78 508 slip op. 12 15 (M.D.Pa., filed September 28, 1979).

**17.** As previously noted, an involuntary patient's right to refuse treatment under such

state officials clearly lacked the power to inflict punishment upon the plaintiff until he had received due process. *Bell v. Wolfish*, 441 U.S. 520, 535–36 n. 17, 99 S.Ct. 1861, 1872–73, 60 L.Ed.2d 447 (1979); *Ingraham v. Wright*, 430 U.S. 651, 674, 97 S.Ct. 1401, 1414, 51 L.Ed.2d 711 (1977); *Wong Wing v. United States*, 163 U.S. 228, 237, 16 S.Ct. 977, 980, 41 L.Ed. 140 (1896).[18] For this reason, Christy's right to challenge his incarceration in CCI remained intact.[19]

■ The second tier of the *Meachum-Vitek* test is also satisfied. The deprivations allegedly suffered by the plaintiff during his six-day stay in maximum security have already been recounted, *e. g.*, lack of exercise and recreation, unsanitary living area,

loss of wages, physical distress. Collectively, these factors would constitute a "major change in the conditions of confinement" which would mandate "minimum procedural safeguards as a hedge against arbitrary determination of the factual predicate for imposition of the sanction." *Wolff v. McDonnell*, 418 U.S. at 571–72 n. 19, 94 S.Ct. at 2982 n. 19. On this basis, the transfer to CCI triggered the plaintiff's liberty interest under the Due Process Clause. Christy's complaint, therefore, states a valid cause of action.[20]

## IV. CHARGES AGAINST HAMMEL

■ The Commonwealth has moved to dismiss the suit against defendant Hammel

---

circumstances remains an open question. *In re Gross*, 476 Pa. at 214 n. 12, 382 A.2d at 122 n. 12.

**18.** The recognized exception to this principle, the summary punishment for contempt of court, bears no relevance to the present suit. *See Bell v. Wolfish*, 441 U.S. at 535–36 n. 17, 99 S.Ct. at 1872 -73.

The instant case must be reconciled with *Montanye v. Haymes*, 427 U.S. 236, 240–43, 96 S.Ct. 2543, 2546 -48, 49 L.Ed.2d 466 (1976), a companion precedent to *Meachum*, in which the Supreme Court held that a prison transfer does not implicate due process even if the move occurs for punitive reasons. The distinguishing factor lies in the difference between penitentiary assignments and solitary confinement. As Justice White noted in *Meachum*, "Transfers between institutions . . . are made for a variety of reasons and often involve no more than informed predictions as to what would be best to serve institutional security or the safety and welfare of the inmate." 427 U.S. at 225, 96 S.Ct. at 2538. Given the high degree of deference courts must grant administrators, this discretionary function generally shall not be reviewed even if the underlying rationale involves discipline. Solitary confinement, conversely, is peculiarly punitive and thus falls under the rationale of *Wolfish, Ingraham*, and *Wong Wing*. *Wolff v. McDonnell*, 418 U.S. 571 72 n. 19, 94 S.Ct. 2982.

**19.** In *Wolff v. McDonnell*, 418 U.S. at 571- 72 n. 19, 94 S.Ct. at 2982 n. 19, Chief Justice Burger acknowledged that:

it would be difficult for the purposes of procedural due process to distinguish between the procedures that are required where good time is forfeited and those that must be extended when solitary confinement is at issue. The latter represents a major change in the conditions of confinement and is normally

imposed only when it is claimed and proved that there has been a major act of misconduct. Here, as in the case of good time, there should be minimum procedural safeguards as a hedge against arbitrary determination of the factual predicate for imposition of the sanction. We do not suggest, however, that the procedures required by today's decision for the deprivation of good time would also be required for the imposition of lesser penalties such as the loss of privileges.

Standing alone, this passage explicitly supports Christy's assertion that relegation to CCI triggers the Due Process Clause. *Meachum v. Fano*, however, contains language which can be read to deprecate the validity of footnote 19 in *Wolff* with the suggestion that the latter case turned solely on the presence of good time credits. 427 U.S. at 225 -28, 96 S.Ct. at 2538 - 40. For this reason, the court has chosen not to rely exclusively on *Wolff* in ruling that the CCI transfer must be accompanied by Fourteenth Amendment safeguards. Yet in light of the *Vitek-Wolfish* analysis, as well as the qualitative differences between respective transfers to solitary confinement and to another prison, it should be concluded that the efficacy of footnote 19 of *Wolff* is very much intact.

**20.** This ruling expresses no opinion as to the type of hearing a Farview inmate would deserve in such a situation. That decision can only be rendered after a careful weighing of interests which are not sufficiently represented in the present record. *Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903. Considering the flexible nature of due process, the judiciary cannot apply the Fourteenth Amendment arbitrarily in an environment as prone to emergencies and difficulties as a mental hospital. For the purpose of resolving the instant motion, it is enough to rule that the punishment of an involuntary mental patient along the lines that

on the ground that the plaintiff's pleadings lack sufficient charges of personal involvement to aver a valid claim. *See Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). In response, Christy has presented an affidavit which supposedly presents allegations that would cure the problem if added to the complaint. At oral argument, the parties disagreed as to whether or not the incorporation of these charges would state a viable case against Hammel.

The present pleadings give no details as to how the former Superintendent participated in the alleged wrongdoing. Thus, unless the complaint is amended, the action against Hammel must fail. *Rotolo v. Borough of Charleroi*, 532 F.2d 920, 922 (3d Cir. 1976). The court, moreover, will not speculate abstractly as to whether the Christy affidavit contains averments which would cure the difficulty. Rather, the plaintiff shall have ten days in which to amend his complaint with the exact charges he intends to make against defendant Hammel.[21] The Commonwealth will at that point be free to renew its motion.

## V. THE ELEVENTH AMENDMENT

In his claim for relief, Christy seeks monetary damages from all three defendants. On behalf of the latter, the Commonwealth has moved to dismiss the claim for relief insofar as it relates to the defendants in their official capacities. The basis for this request is the assertion that the Eleventh Amendment bars damage awards paid from the state treasury. The argument is correct. *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 1143–45, 59 L.Ed.2d 358 (1979); *Edelman v. Jordan*, 415 U.S. 651, 660–78, 94 S.Ct. 1347, 1354–63, 39 L.Ed.2d 662 (1974); *Skehan v. Board of Trustees of Bloomsburg State College*, 590 F.2d 470, 486–91 (3d Cir. 1978), *cert. denied*, 444 U.S. 832, 100 S.Ct.

61, 62 L.Ed.2d 41 (1980). Furthermore, Christy has not suggested that any of the recognized exceptions to sovereign immunity should apply. The Commonwealth's motion on this issue, therefore, will be granted.[22]

## VI. CLASS CERTIFICATION

The plaintiff has asked that this litigation be certified a class action under Federal Rule of Civil Procedure 23(b)(2) which permits such an order when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." The proposed class would include all present and future Farview inmates. In deciding this matter, the court must answer two questions. First, it is essential to determine if Christy's claim qualifies as a general class action under Federal Rule 23(a). Subsequently, the court must decide if the plaintiff's suit also conforms to the more specific mandates of Rule 23(b)(2).

A case will not be categorized as a class action unless:

(1) the class is so numerous that joinder of all members is impracticable,

(2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representatives are typical of the claims or defenses of the class, and

(4) the representative parties will fairly protect the interests of the class.

*See* Fed.R.Civ.P. 23(a). Christy maintains that all of these criteria are satisfied in his situation. The Commonwealth has not contested the first assertion, *viz.*, that the class is so "numerous" that joinder would be impracticable. Yet disagreement exists with regard to the remaining factors.

---

occurred in the instant case may only occur after the dictates of due process are recognized. The nature of those requirements will be determined later in the course of the litigation.

**21.** Failure to comply with this deadline will lead to dismissal of the action against defendant Hammel.

**22.** The monetary claims against the defendants in their personal capacities, however, will remain intact.

■ Concerning the second point of consideration, the defendants argue that the alleged facts of the plaintiff's incarceration are so peculiar as to rob the case of its class character. Rule 23(a)(2), however, permits certification whenever there is a major question of "law or fact common to the class." The former exists; namely, whether the court should mandate the disciplinary hearings demanded by Christy. *Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903. The existence of this common contention satisfies the Rule 23(a)(2) requirement. *See Yearsley v. Scranton Housing Authority*, 487 F.Supp. 784 (M.D.Pa.1979).

■ The third criterion demands that the plaintiff's theory for relief be "typical" of the claims held by the other class members. Once more, the Commonwealth maintains that the facts underlying Christy's suit are too particularized to justify Rule 23 certification. This contention is incorrect. The "typicality" requirement of Rule 23(a)(3) does not preclude certification simply because the individual circumstances behind the grievances of the various persons in the proposed class differ. In such situations, a class action may be declared as long as the claims of the representative "and the other class members are based on the same legal or remedial theory." *Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181, 1189 (10th Cir. 1975).

■ Our Court of Appeals has ruled that when "the interests of the named class representatives and the unnamed class members coincide, there is no question but that insofar as the claims are concerned the typicality requirement of subdivision (a) [of Rule 23] is satisfied." *Scott v. University of Delaware*, 601 F.2d 76, 85 (3d Cir. 1979), *cert. denied*, 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979). Christy seeks to represent all present and future Farview residents.[23] On the injunctive issue, he requests the establishment of procedural safeguards that would protect all inmates from unjust incarceration in maximum confinement. Furthermore, the only possible basis for this claim is the Due Process Clause, which creates a right common to all class members. Accordingly, it is clear that the interests of Christy and the other class members do coincide on the injunction question.[24] Rule 23(a)(3) is satisfied with regard to the latter issue. *Id.*; *Yearsley v. Scranton Housing Authority*, 487 F.Supp. at 786–87; *Dawes v. Philadelphia Gas Commission*, 421 F.Supp. 806, 813 (E.D.Pa.1976).[25]

The final Rule 23(a) consideration concerns the ability to represent the class fairly and adequately. According to the Commonwealth, Christy's interests are sufficiently divergent from those of the other class members to disqualify him as an overall representative. The defendants contend that if the plaintiff obtains the injunctive relief he desires, the result would likely be a great burden on the Farview staff which would directly diminish the quality of medical and psychiatric care available to the patients. This argument misconceives the cause of action recognized by the court. Christy's complaint is construed to challenge the right of the defendants to *punish* mental hospital inmates. This case in no

---

**23.** The Commonwealth offers a bald assertion to the effect that the number of Farview residents subject to transfer to CCI may be less than the total population. Indeed, the defendants suggest that the total may be so small that Rule 23(a)(1) would prohibit class certification. In the event that such is the case, the Commonwealth should present a de-certification motion together with the basis for the claim.

**24.** As noted at the outset of this Memorandum, the certification order presently granted will be limited to the injunctive issue. For a discussion of the non-injunctive issues, see note 26, *infra* and accompanying text.

**25.** This case is clearly distinguishable from *Mays v. Scranton Police Department*, 87 F.R.D. 310 (M.D.Pa., 1979). In that suit the plaintiff attacked the validity of a state law which permitted the towing of allegedly abandoned cars without notice to the owners. Yet the proposed class was so large (*i. e.*, essentially all owners of automobiles located within the state) and the list of objections to the statute was so varied that it was not possible to label the plaintiff's claim "typical" of the class. In the instant situation, one remedy is sought on the basis of one constitutional argument. None of the problems confronted in *Mays* are evident.

way implicates therapeutic treatment or the right to deal with *bona fide* emergencies. Any relief the inmate might receive, moreover, would be carefully fashioned so as not to interfere with the workings of Pennsylvania's mental health system. *Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903. Therefore, the Commonwealth's fear of antagonistic interests between Christy and the other Farview residents is unpersuasive.

■ Since the demands of Rule 23(a) have been met, it is necessary to discover if the suit can be classified under one of the categories set forth in Rule 23(b). As already noted, the plaintiff has specifically requested that subsection 23(b)(2) be selected. This provision would limit certification to the injunction question.[26] The court must consider if the designation is proper.

■ In *Martin v. Easton Publishing Company*, 73 F.R.D. 678, 683 (E.D.Pa.1977), Judge Troutman set forth the test for Rule 23(b)(2) thusly: ". . . the interests of the class members must be so like those of the individual representative that injustice will not result from their being bound by said judgment in the application of the principles of res judicata." This court has accepted the validity of that definition. *Yearsley v. Scranton Housing Authority*, 487 F.Supp. at 787. *See also Webb v. Westinghouse Electric Corporation*, 78 F.R.D. 645, 650–51 (E.D.Pa.1978). In the instant case, the requisites of the test have clearly been met. The Commonwealth's arguments establish the fact that the Farview authorities deny the need to provide prepunishment hearings because of a conviction that such procedures are not constitutionally required. Therefore, the patients as a class are deprived of the remedy that Christy seeks. Furthermore, the fact that the plaintiff presents one identical argu-

ment on behalf of all the residents demonstrates that the proposed class is so cohesive that unfairness would not result from binding all members to one judgment.[27] Thus, Rule 23(b)(2) certification is in order.

■ The final question on the class certification issue relates to the question of mootness. Christy no longer resides at Farview. For that reason his request for equitable relief is technically moot. The court must determine whether or not Rule 23 certification shall be permitted to "relate back" to the time of the plaintiff's original motion and thereby maintain the viability of the suit. *Sosna v. Iowa*, 419 U.S. 393, 397–403, 95 S.Ct. 553, 556–559, 42 L.Ed.2d 532 (1975). Under the present circumstances, the "relation back" doctrine will come into play if the following are true: (1) the claim is "so inherently transitory that the trial court will not even have time to rule on a motion for class certification before the proposed representative's individual interest expires" and (2) "the constant existence of a class of persons suffering the deprivation is certain." *United States Parole Commission v. Geraghty*, 388, 397–401 U.S. 445, 100 S.Ct. 1202, 1209–11, 63 L.Ed.2d 479 (1980); *Gerstein v. Pugh*, 420 U.S. 103, 110 n. 11, 95 S.Ct. 854, 861, 43 L.Ed.2d 54 (1975). Both of these requirements are fulfilled.

The law requires that incarceration at an institution such as Farview last for a "transitory" period. This fact reflects the constitutional constraints upon the state's ability to exercise civil commitment. *O'Connor v. Donaldson*, 422 U.S. 563, 576, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975). In Pennsylvania, the initial authorization for involuntary treatment may last no more than ninety days. 50 P.S. § 7304(g)(1).[28]

---

**26.** By its terms, Rule 23(b)(2) only extends to "injunctive or corresponding declaratory relief." The court, nonetheless, may still certify the class action on the injunction issue and then treat the rest of the case as "incidental." Fed.R.Civ.P. 23(c)(4)(A). *See* Wright and Miller, *Federal Practice and Procedure*: Civil § 1775, pp. 23 24 (1972).

**27.** Of course, if further litigation should demonstrate that Christy's situation is in fact so unique that the type of due process which he deserves is substantially different from that of the other class members, the Commonwealth could again move for de-certification.

**28.** This period is increased to one year if the patient has been charged with the commission of a designated major crime and either found

Extensions of this period require new hearings and specific findings of fact. Furthermore, unless the case is reexamined periodically, the patient must be released. 50 P.S. § 7305(a). Finally, an involuntary patient is to be returned to the outside world [29] when he or she no longer requires institutional care. 50 P.S. § 7304(g)(3) and (4). Clearly, an assignment to Farview is designed to last for the shortest possible period necessary to treat the inmate and to protect society. It is not possible to predict exactly how long a particular person will be at the hospital. As in *Gerstein v. Pugh*, 420 U.S. at 110–111 n. 11, 95 S.Ct. at 861:

> [t]he length of . . . custody cannot be ascertained at the outset and it may be ended at any time. . . . It is by no means certain that any individual, named as plaintiff, would be in . . . custody long enough for a district judge to certify the class.

Considering that it has taken more than a year for this motion to ripen and that an inmate's stay at Farview is by its nature indefinite, the "transitory" requirement of *Geraghty* and *Gerstein* is satisfied.

■ The second criterion is also met. The Commonwealth has never denied that the number or residents at the hospital is large enough to form a class. As the situation presently stands, these individuals have no established right to a due process hearing prior to punitive transfer to CCI. The constant existence of this group is certain. Accordingly, the fact that Christy's plea for an injunctive remedy has technically lapsed does not bar certification. *Id.*

## VII. INTERVENTION

■ The final issue before the court involves the petition for intervention. Kim E. Niehoff currently lives at Farview. He claims that during the evening of November 5, 1979, "subsequent to an incident of unknown proportions or origin," he was handcuffed and moved from AAII to CCI. Again, defendant Wenger supposedly ordered the transfer.[30] This stay in maximum security is said to have lasted fifteen days. Like Christy, Niehoff seeks both monetary and injunctive remedies.

This situation certainly does not involve intervention by right. No federal statute guarantees permission for such an entry. Furthermore, the court has already ruled that the original plaintiff adequately protects the interests of the class. For these reasons, Niehoff has no absolute right to intervene. Fed.R.Civ.P. 24(a). *See* Wright & Miller, *Federal Practice and Procedure*: Civil § 1779, pp. 252–253 (1972). Permissive entry, nonetheless, still may occur under either Rule 23(d) or 24(b).

In *Groves v. Insurance Company of North America*, 433 F.Supp. 877, 888–89 (E.D.Pa. 1977), Judge Ditter explained that such a situation calls for a balancing of interests. On one hand, it is necessary to decide if the proposed intervention would strengthen the representation of the class. Simultaneously, the court must consider whether or not entry of the new plaintiff will prejudice the defendants. *See Dickerson v. United States Steel Corporation*, 582 F.2d 827, 831–32 (3d Cir. 1978). *Groves* also indicates that in a close case the balance should favor intervention.

■ A review of the facts indicates that Niehoff should be allowed to enter the litigation. The procedural posture is such that the Commonwealth will not suffer any prejudice as a result of intervention. Furthermore, the presence of the new plaintiff will not lead to undue problems or delay in handling this matter. Indeed, the com-

---

incompetent to stand trial or not guilty by reason of insanity. 50 P.S. § 7304(g)(2).

**29.** The inmate may be returned to prison in the event that he or she is still serving a valid sentence.

**30.** Niehoff's claim differs little from Christy's. The only significant distinction concerns the alleged conduct of certain defendants. Christy's complaint names only Hammel, Wenger, and Myers. Niehoff asserts that in addition to Hammel and Wenger, the following persons took part in his deprivation: Joel Hersh, an assistant administrator; Robert Gross, a security aide; and Jerry Stanwich, a social worker.

plaints of Christy and Niehoff are so similar that had they been filed separately they would have been likely candidates for consolidation under Federal Rule of Civil Procedure 42(a).[31] Judicial time and effort will be conserved by handling these cases together. A joint disposition of the claims, moreover, will facilitate representation of the class by painting a fuller picture of the conditions at Farview and thereby providing assistance to the court in determining whether or not to grant the injunctive remedies sought by Christy and Niehoff. Permission to intervene, therefore, will be granted.

---

31. To a large extent, the policies behind intervention and consolidation are analogous. *See Davis v. Board of School Commissioners of*   *Mobile County,* 517 F.2d 1044, 1049 (5th Cir. 1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976).