Clifford GOLDY, et al., Plaintiffs,

v.

Frank BEAL, et al., Defendants.

Civ. No. 75–0791.

United States District Court,
M. D. Pennsylvania.

July 27, 1981.

Robert Elion, Jon C. Lyons, Williamsport, Pa., David Ferleger, Philadelphia, Pa., for plaintiffs.

Norman Watkins, Deputy Atty. Gen., Harrisburg, Pa., Jonathan Vipond, Philadelphia, Pa., Charles W. Johns, Howland Abramson, Philadelphia, Pa., for defendants.

Before ROSENN, Circuit Judge, NEALON, District Judge.

### MEMORANDUM

NEALON, District Judge.

### I.  FACTS

The dispute presently before the court concerns post-trial discovery.  The plaintiffs have filed a motion to compel the defendants to produce certain documents and to answer designated interrogatories.

In response, the Commonwealth has sought a protective order.[1] The case is in a very unusual procedural posture, because this dispute has arisen years after the official closing of the litigation. A careful review of the facts must precede any decision.

The plaintiffs filed their initial complaint on July 8, 1975. They primarily sought to enjoin enforcement of 50 P.S. § 4406, a Pennsylvania statute which governed involuntary institutionalization of individuals suffering from "mental disability." The complainants received permission to proceed in forma pauperis. In August 1975, the matter was tried before a three-judge court. A decision was rendered on July 8, 1976. In a unanimous opinion, the panel granted the plaintiffs' motion for class-certification and declared § 4406 "unconstitutionally vague." Goldy v. Beal, 429 F.Supp. 640, 647–49 (M.D.Pa.1976). On this basis, the court enjoined enforcement of the statute.

Subsequently, this case became complicated by a new legal reform. One day after the three-judge panel announced its holding with regard to the validity of § 4406, the Pennsylvania Legislature enacted a new Mental Health Procedures Act ("MHPA"), 50 P.S. 7101, et seq.[2] This law greatly increased the procedural rights enjoyed by the "mentally ill." By its terms, nevertheless, the Act protects "[p]ersons who are mentally retarded, senile, alcoholic, or drug dependent only if they are also diagnosed as mentally ill." 50 P.S. § 7102.[3] The court amended its judgment to allow for the important changes wrought by the new legislation.

On July 19, 1976, the panel decision was modified by a stay order which, in effect, recognized that § 4406 had been repealed and sanctioned the procedures of the MHPA.[4] The court, however, noted that the new legislation did not cover the mentally retarded. Steps were taken to remedy this omission. The parties submitted a stipulation which noted that the Pennsylvania Legislature was considering a parallel reform with regard to the mentally retarded. The agreement established minimum protections that would pertain to involuntary institutionalizations of such individuals until passage of a new Act. The court approved the stipulation on October 28, 1976.[5]

---

1. In reality, there are two sets of defendants, viz., executive officials in the state government and members of the Pennsylvania judiciary. The defendants shall be collectively labeled the "Commonwealth." Technically, the protective order only applies to the judicial defendants, who filed the motion for that relief. Resolution of the motion to compel, however, will decide the discovery issues with regard to all parties.

    Plaintiffs seek extremely detailed and voluminous information. Their interrogatories, for example, ask specific questions about every involuntary mental institutionalization in Pennsylvania between November 13, 1976 and December 31, 1980, including the grounds for each commitment, the duration of the treatment periods, and the judicial procedures afforded the patients. The complainants also request a wide variety of records. See Document 48 of the Record.

2. Certain sections of that statute are discussed in Christy v. Hammel, 87 F.R.D. 381, 384–88 (M.D.Pa.1980).

3. According to 50 P.S. § 4102, mental retardation is defined thusly:

    ... subaverage general intellectual functioning which originates during the developmental period and is associated with impairment of one or more of the following: (1) maturation, (2) learning and (3) social adjustment.

4. The MHPA did not go into effect until sixty days after its enactment. The stay order established procedures for commitments that would take place during the interim. The terms of these institutionalizations mirrored the provisions established by the MHPA. See P.S. § 7301.

5. The agreement provided that such involuntary placements would only occur after a judicial hearing which met the following standards:

    A person shall be determined to be a mentally retarded person in need of residential placement only upon the following findings:

    (1) The person is impaired in adaptive behavior to a significant degree and is functioning at an intellectual level two standard deviation measurements below the norm as determined by acceptable psychological testing techniques;

    (2) The impairment [sic] and the resultant disability were manifested before the person's 18th birthday and are likely to continue for an indefinite period; and

    (3) The person, because of his retardation presents a substantial risk of physical injury

Approximately one month later, a motion by the Commonwealth to overturn the panel opinion was denied. An appeal by the defendants was later dismissed on agreement of the parties.

The instant controversy arises from the fact that the Pennsylvania Legislature never passed the anticipated reform. In their motion to compel, the complainants assert that during the years since entry of the stay, involuntary institutionalization of the mentally retarded has occurred in accordance with the rules prescribed by the order of October 28, 1976. Meanwhile, the Commonwealth has adopted a policy and practice "disfavoring institutionalization of retarded persons. . . ." The plaintiffs now seek information to develop judgments on whether there should be any change in the commitment procedures for the retarded in Pennsylvania. The plaintiffs argue that these "temporary" standards are in need of review. The proposed discovery is supposedly designed to aid in this reexamination. According to counsel for the complainants:

> It may be the limited temporary stay should be made permanent. It may be the stay should be [amended]. Perhaps the stay should be dissolved. The only way plaintiffs and the Court can develop informed judgments on these and related questions is to obtain information on the status of commitment in Pennsylvania since 1976. Whether many people are committed for compelling reasons or lengthy stays or few for insubstantial reasons or short stays are important factors in evaluating the next necessary steps to concluding this litigation.

See Document 52 of the Record at 2.

At the outset, it is necessary to characterize properly the order entered on October 28, 1976. The stipulation did not provide for a "stay" in the sense that the court intended to interrupt proceedings temporarily and later resume litigation of the case. On the contrary, the plaintiffs' argument had been tried fully and fairly. The complainants received the relief that they had initially sought, i. e., invalidation of § 4406. The October 1976 order added to their victory by providing the mentally retarded with concrete procedural safeguards. Concededly, all parties to the suit expected that these protections would eventually be superseded by state legislation. Nonetheless, the court approved the stipulation only after it found that the designated procedures were constitutionally adequate in their own right. Nothing in the October 1976 order suggested that the mentally retarded have a right under the Due Process Clause to greater safeguards. On the contrary, the stipulation established the minimum level of relief required by the Constitution, and permitted the Pennsylvania Legislature to codify or expand these procedures with a new Act.

The plaintiffs now contend that subsequent developments, especially the Legislature's failure to enact the anticipated reform, have cast doubt on the continued validity of the stipulation. The Federal Rules of Civil Procedure permit a district court to modify a permanent injunction when later events render prospective enforcement inequitable. Such relief, however, requires that the previous judgment be set aside under Federal Rule of Civil Procedure 60(b)(5).[6] In effect, the complainants are requesting discovery to assist in reconsideration of a "final" ruling. This fact is crucial to resolution of the instant motions.

---

to himself or physical debilitation as demonstrated by behavior within 30 days of the petition which shows that he is unable to provide for, and is not providing for his most basic need for nourishment, personal and medical care, shelter, self-protection and safety and that provision for such needs is not available and cannot be developed or provided in his own home or in his own community without residential placement.

6. Rule 60(b)(5) sets an "exacting" standard for any movant seeking relief. See Wright & Miller, *Federal Practice and Procedure: Civil* § 2863 at 208 (1973). See *Hodge v. Hodge*, 621 F.2d 590, 593 (3d Cir. 1980); *Philadelphia Welfare Rights Organization v. Shapp*, 602 F.2d 1114, 1119–20 (3d Cir. 1979); *cert. denied sub nom. Thornburgh v. Philadelphia Welfare Rights Organization*, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980); *Mayberry v. Maroney*, 558 F.2d 1159, 1163–64 (3d Cir. 1977).

## II. LEGAL DISCUSSION

■ The normal rules governing discovery pertain to the period between the pleadings and trial. *See* Fed.R.Civ.P. 26–37. In the early stages of litigation, the parties are permitted broad access to information held by the other side. This right exists notwithstanding the fact that compliance with discovery often creates considerable burdens for the opponent. The reason for this liberal attitude is simple. A basic policy underlying the Federal Rules of Civil Procedure is the conviction that both the plaintiff and the defendant must be permitted to scrutinize all relevant evidence so that each will have a fair opportunity to present its case at trial. The flexible provisions contained in the Federal Rules serve this end.[7] As Justice Murphy explained in the landmark opinion of *Hickman v. Taylor*, 329 U.S. 495, 507, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947):

> We agree, of course, that the deposition-discovery rules are to be accorded a broad and liberal treatment. No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case. Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession. The deposition-discovery procedure simply advances the stage at which the disclosure can be compelled from the time of trial to the period preceding it, thus reducing the possibility of surprise. [footnote omitted]

Yet the instant action does not involve trial preparation. At issue is the extent to which a former litigant can be forced to bear the burdens incidental to discovery in order to enable an erstwhile adversary to assess the possibility of a Rule 60 motion. There is not much authority in this area. The precedents that do exist hold that the normal rules concerning interrogatories and requests for documents do not apply.

*H. K. Porter Company, Inc. v. Goodyear Tire & Rubber Company*, 536 F.2d 1115 (6th Cir. 1976) involved an attempt by a losing party to overturn a judgment on the basis of fraud. Federal Rule of Civil Procedure 60(b)(3) places a heavy burden on any party who seeks such relief. The movant, nevertheless, contended that its adversary had possession of certain documents which, if exposed, would support the request for opening the judgment. Discovery was sought on this basis. In a unanimous opinion, the Court of Appeals affirmed the decision denying this request.

Writing for the panel, Judge Weick began with the following observation:

> ... We must recognize that a request for discovery for the purpose of attacking a final judgment involves considerations not present in pursuing discovery in a pending action prior to a judgment. Primary among these considerations is the public interest of the judiciary in protecting the finality of judgments.

*Id.* at 1118. After weighing the various interests at stake, the *Porter* court held that in instances where post-trial discovery is sought, "it is well within [the district judge's] discretion to require the moving party to make a showing in support of its allegations before requiring the prevailing party to submit a second time to extensive discovery to protect his judgment." *Id.* at 1119. The movant had failed to present such a *prima facie* offer of proof; consequently, the panel ruled that there was no right to additional discovery. *Id.* at 1118–19.

In *Valerio v. Boise Cascade Corporation*, 80 F.R.D. 626 (N.D.Cal.1978), *aff'd*, 645 F.2d 699 (9th Cir. 1981), the United States District Court for the Northern District of California adopted the *Porter* rationale. The litigation involved an attempt to vacate a class action settlement which, in the view

---

7. Some distinguished observers have concluded that the present discovery practices may be too liberal. *See, e. g., ACF Industries, Inc. v. Equal Employment Opportunity Commission*, 439 U.S. 1081, 1086–88, 99 S.Ct. 865, 868–69, 59 L.Ed.2d 52 (1979) (Powell, J., dissenting from denial of certiorari).

of the movants, had been induced through fraud. Like their counterparts in *Porter*, the *Valerio* complainants contended that they could corroborate their accusations if permitted discovery.[8] Their argument was unsuccessful. In resolving the matter, Chief Judge Peckham agreed with the *Porter* opinion that the public interest in the "finality of judgments" places post-trial discovery in an entirely different light from normal pretrial procedures. Significantly, he found this consideration "even more pressing in a class action context" where a large number of litigants will be affected by any change in the original decision. The *Valerio* plaintiffs had not made any *prima facie* demonstration of success on the merits. Therefore, Chief Judge Peckham denied the request for discovery, and he ultimately ruled for the defendants. 80 F.R.D. at 646–47.[9]

In a sense, *Porter* and *Valerio* differ from the instant case in that they concerned Rule 60 claims based on fraud. This distinction, however, does not render the precedents inapplicable, because neither holding turned on the fraud issue. Rather, *Porter* and *Valerio* stand for the proposition that post-judgment discovery must be assessed according to policies quite apart from those at stake in the period before trial. Both opinions concluded that in the context of Rule 60, the social interest involved in the "finality" of judgments must be taken into account and discovery should be disallowed unless the movant has made a *prima facie* demonstration of success on the merits. In the instant case, the plaintiffs also

question a ruling which conclusively disposed of litigation. Thus, the "finality of judgment" analysis is very applicable.

This court, moreover, finds the *Porter-Valerio* rationale persuasive. The present controversy had undergone a long process of litigation. The complainants agreed to the terms of the injunction they now call into question.[10] Furthermore, they implicitly concede that they have no concrete facts behind their suspicion that the October 1976 order needs an overhaul. Without any substantive basis for attacking the judgment entered almost five years ago, they merely feel that the time is ripe for a periodic review of the operative effects of the relief we awarded in their behalf. In short, the plaintiffs would have the court reopen this complex case to permit them to enter into a speculative inquiry on whether the present standards for institutionalizing the mentally retarded in Pennsylvania are constitutionally adequate.

Public policy, however, requires that all litigation eventually come to an end. *Federated Department Stores, Inc. v. Moitie*, —— U.S. ——, ——, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103 (1981). If the court granted the plaintiffs the right to discovery at this point, then the logic of its decision would subject nearly every party enjoying the benefits of a permanent injunction to a perpetual duty to endure discovery throughout the years following the close of the suit. That result would be anomalous, since it would flout the entire concept of "final judgment," and impose burdens far

---

8. *Valerio* and *Porter* differed procedurally in that the plaintiffs in the former suit sought relief through a separate action rather than a Rule 60 motion. The two remedies, nonetheless, are co-extensive. *See* Wright & Miller, *Federal Practice and Procedure*: Civil § 2868 (1973). Thus, the *Valerio* court properly treated the complainant's request as a plea for post-judgment discovery.

9. The *Valerio* opinion contained the following passage:

   Had the plaintiffs presented some evidence of fraud on the court, we think these considerations might be sufficiently outweighed by the countervailing public interest in 'preservation of the integrity of the judicial process,'

to warrant withholding our decision pending further discovery.

*Id.* at 647 (citation omitted). The Court of Appeals for the Ninth Circuit recently affirmed in a *per curiam* decision which contained the following statement: "We have closely examined the many arguments made by appellants in their briefs and find them fully answered in Judge Peckham's lengthy and careful opinion. . . . We now adopt that opinion." At 700.

10. Our Court of Appeals has suggested that the burden of a Rule 60(b) movant is greater with regard to voluntary settlement than normal adjudication. *Philadelphia Welfare Rights Organization v. Shapp*, 602 F.2d at 1120.

beyond those envisioned by the Federal Rules of Civil Procedure.

■ In the instant case, the plaintiffs do not suggest that they can satisfy the *Porter-Valerio prima facie* test. Indeed, their entire purpose in seeking discovery is to investigate the possibility of relief if any evidence of constitutional violations materializes. While such a "fishing expedition" might be appropriate before trial, it cannot be authorized now, nearly five years after the initial judgment.

■ Finally, the court shall address the plaintiffs' waiver argument. The complainants initially filed their discovery requests on January 7, 1981. The executive defendants submitted their objections on February 6th, but the judicial defendants did not move for a protective order until February 19th. Federal Rules of Civil Procedure 33(a) and 34(b) provide that a litigant who fails to respond to interrogatories and document requests within thirty days of their service generally waives all objections to discovery. Implementation of these time requirements would obligate the court to order the judicial defendants to comply with discovery. In the context of pretrial procedure, the deadlines are enforced strictly. *Antico v. Honda of Camden*, 85 F.R.D. 34, 35–36 (E.D.Pa.1979) (production of documents); *United States v. 58.16 Acres of Land*, 66 F.R.D. 570–572 (N.D.Ill.1975) (interrogatories). Under the facts of the instant litigation, however, two reasons exist for not applying Federal Rules 33(a) and 34(b).

First, the interests of the judicial and executive defendants are closely intertwined. *See* n.1, *supra.* Indeed, the sole difference in their legal positions is that they are represented by different sets of counsel. Otherwise, their arguments are essentially identical. The plaintiffs' motion to compel was precipitated by the executive defendants' objections to interrogatories which essentially raised the same issues as the judicial defendants' motion for a protective order. In this case there is no justification for treating the parties separately for the purposes of discovery, especially since the judiciary probably does not have access to much of the statistical data sought by the plaintiffs.

Second, Rules 33(a) and 34(b) are designed for pretrial procedure. On this basis, they assign considerable burdens to the party from whom discovery is sought. *See Antico v. Honda of Camden*, 85 F.R.D. at 35–36 (thirty-day response deadline); *Martin v. Easton Publishing Company*, 85 F.R.D. 312, 316 (E.D.Pa.1980) (specificity in replies); *In re Folding Carton Antitrust Litigation*, 83 F.R.D. 251, 254 (N.D.Ill.1978) (burden of persuasion in asserting objections). While this court does not conclude that these provisions are suspended in all cases involving post-trial litigation, they should not be automatically applied under the circumstances presented here. As already explained, the plaintiffs' discovery requests were submitted years after the close of the suit and before any Rule 60 motion had been presented. Consequently, the Commonwealth had no reason to know exactly why the desired information was sought (*e. g.*, to attack the judgment, to prepare for future litigation). Without a benchmark for relevance, the defendants could hardly be expected to respond under the terms of Rules 33(a) and 34(b).

Therefore, the Commonwealth's request for a protective order is granted, and the complainants' motion to compel is denied.[11]

---

11. Federal Rule of Civil Procedure 37(a)(4) requires that a district court grant expenses, including attorney's fees, to the prevailing side in a discovery motion unless it finds that the losing side's conduct "was substantially justified or that other circumstances make an award of expenses unjust." The present record does not permit a ruling on the issue. Indeed, the court is not certain if the Commonwealth feels that this type of award is appropriate. Consequently, if the defendants decide to seek expenses under Rule 37(a)(4), then they should file a brief and supporting documentation with the court within ten (10) days of the docketing of this Memorandum and Order. In the event that such a submission is made, then the plaintiffs will have an additional ten (10) days in which to respond. *See H. K. Porter Company, Inc. v. Goodyear Tire & Rubber Company*, 536 F.2d at 1124–25.