564 F.2d 792
 Michael S. POLIZZI and Anthony J. Zerilli, Appellees,
v.
Maurice SIGLER, Chairman, United States Board of Parole,
United States Board of Parole, L. R. Putnam, Warden, Federal
Correctional Institution, Sandstone, Minnesota, and the
United States Bureau of Prisons, Appellants.
 No. 77-1059.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 2, 1977.
Decided Oct. 27, 1977.
Rehearing Denied Jan. 10, 1978.
 
 Patrick J. Glynn, U. S. Dept. of Justice, Washington, D. C. (argued), Robert G. Renner, U. S. Atty. and Daniel M. Scott, Asst. U. S. Atty., Minneapolis, Minn., George W. Calhoun, Atty., Dept. of Justice, Washington, D. C. and Richard L. Thornburgh, Asst. Atty. Gen., Washington, D. C., appears on appellants' brief and Benjamin R. Civiletti, Asst. Atty. Gen., Washington, D. C., appears on appellants' reply brief, for appellants.
 Peter J. Thompson, Minneapolis, Minn., for appellees.
 Before BRIGHT, ROSS and HENLEY, Circuit Judges.
 BRIGHT, Circuit Judge.
 
 
 1
 The United States Bureau of Prisons classified Michael S. Polizzi and Anthony J. Zerilli as "special offenders" upon their entrance into the federal prison system because of their alleged links with organized crime.[1] Polizzi and Zerilli brought these habeas corpus actions, consolidated for hearing before the district court, claiming that such classification subjected them to more onerous conditions of confinement than the general prison population and that lack of a hearing prior to the classification violated their right to due process of law. The district court[2] agreed and ordered the Bureau of Prisons to remove the designation from these inmates' files and to provide notice and a hearing if it seeks to reinstate the classification. The Government appealed, contending that (1) procedural due process protections do not apply or (2) if they do, present Bureau of Prisons procedures comply with due process requirements. We affirm, with modifications, rejecting the Government's first argument and agreeing, in part, with the Government's second argument.
 
 
 2
 I. Bureau of Prisons' Policy Statements.
 
 
 3
 By its policy statement No. 7900.47, dated April 30, 1974, the United States Bureau of Prisons established a policy of classifying as "special offenders" certain prisoners who present "special prison management problems" and require "special handling." Such persons "may not be transferred or approved for any community activities without prior approval from the Central Office, Correctional Programs Division (of the Bureau of Prisons)." The policy statement indicated that a special offender designation would apply to: (1) nonfederal offenders serving time in a federal prison facility; (2) federal offenders who, according to official investigative reports, have been involved in sophisticated criminal activity of an organized nature, or who have been closely or frequently associated with individuals participating in organized criminal activity; (3) offenders whose lives require special protection; (4) offenders who have become custody risks because of escape attempts or other disruptive activities; (5) subversives; (6) offenders whose cases have caused broad national publicity or whose presence in the community would probably generate undue adverse public reaction; (7) offenders who have made threats against high government officials; and (8) other offenders who require especially close supervision for the offender's own protection or the protection of others. The Bureau of Prisons personnel determined a prisoner to be a special offender by following procedures outlined in the policy statement and relying on court records or other information available to them. The policy provided no opportunity for an offender to object to this classification.
 
 
 4
 After policy statement No. 7900.47 came under attack in the federal courts for failure to afford affected federal prisoners due process, see, e. g., Holmes v. Board of Parole, 541 F.2d 1243 (7th Cir. 1976); Cardaropoli v. Norton, 523 F.2d 990 (2d Cir. 1975), the Bureau of Prisons modified its policy. It cancelled policy statement No. 7900.47 and substituted policy statement No. 7900.53, effective April 7, 1976. That policy statement changed the label from "special offender" to "central monitoring case." In a substantial change from the prior policy statement, the Bureau of Prisons directed that the affected inmate be advised of the designation, be given the opportunity to dispute the designation, and be allowed to submit written information bearing on the inmate's objection to the designation.[3]
 
 
 5
 II. Appellees' Classifications.
 
 
 6
 Upon entering the federal prison system, Polizzi and Zerilli were designated special offenders pursuant to the April 30, 1974, policy statement because information allegedly linked them directly with organized crime. The Bureau of Prisons neither notified Polizzi and Zerilli of the designation at that time nor provided them a hearing or opportunity to present evidence in opposition to that designation. These inmates learned during the parole process several months later that they had been classified as special offenders. Each filed an administrative appeal seeking to overturn the designation without success.
 
 
 7
 Both filed habeas corpus petitions in 1976. Polizzi filed his petition in January prior to the change in the Bureau of Prisons policy. Zerilli filed his petition in May of 1976, following the issuance of the policy statement No. 7900.53.
 
 
 8
 The district court granted relief to both petitioners. The court reasoned that the consequences of the special offender designation were sufficiently grievous to warrant due process protection. Judge Larson also considered the degree of procedural protection required, i. e., what process was due, noting as follows:
 
 
 9
 The degree of procedural protection required in any given type of case must be commensurate with the "loss" suffered, and the interests of the inmate must be balanced against the interests of the penal system and the public. Wolff v. McDonnell, supra, 418 U.S. 556, 560, 94 S.Ct. 2963; Cardaropoli v. Norton, supra, 996; Catalano v. United States, 383 F.Supp. 346, 353 (D.Conn.1974). Prison authorities have a legitimate interest in maintaining a special case management program for those inmates whose presence in the prison population or in society at large creates unusual problems of prison security, public safety, or public relations. Prisoners have an interest in retaining the vestiges of liberty that remain theirs after conviction and sentencing.
 
 
 10
 Relying on the Second Circuit's ruling in Cardaropoli v. Norton, supra, 523 F.2d at 990, Judge Larson ordered the following minimum procedural protections:
 
 
 11
 Before the "special offender" label attaches, the prisoner should receive ten days' notice of hearing on the issue, a statement of reasons and evidentiary basis for the designation, and a hearing in which he has the opportunity to appear personally and present evidence in order to make his version of the facts clear before the decision is made. Confrontation and cross-examination of witnesses is not necessary where, as in most of these cases, the evidence on which the prison officials rely is only documentary, nor are the fact questions so complex that the right to counsel must attach; however, the prisoner should be allowed to bring in counsel if he cannot assemble or present the evidence on his own. In order to avoid prejudice to the inmate, this hearing should not be combined with any form of parole hearing. It should be held before an examiner who is neutral in that he has not had personal knowledge of the information on which the designation is based; the inmate's caseworker, however, should be eligible to participate. The inmate is entitled to have the hearing officer's written opinion, stating the factual basis of his decision, within sixty days of the hearing. Appeal through the channels referred to in Bureau of Prisons Policy Statement No. 7900.53 (regional, then General Counsel; or direct appeal to General Counsel) should be available. (footnote omitted.)
 
 
 12
 With this background, we turn to the issues.
 
 
 13
 III. The Liberty Interest.
 
 
 14
 Polizzi and Zerilli claim the special offender classification deprives them of liberty without due process of law. That designation does, indeed, impose substantial burdens. It restricts the prisoner's opportunities to participate in prison furloughs and community-based rehabilitation programs. Moreover, the basis for the classification information linking Polizzi and Zerilli with organized crime could impose a stigma lasting beyond their incarceration. The Court of Appeals for the Second and Seventh Circuits have concluded that classifying a prisoner as a special offender without a hearing deprives that prisoner of liberty without due process. Holmes v. Board of Parole, supra, 541 F.2d 1243; Cardaropoli v. Norton, supra, 523 F.2d 990. Addressing the due process issue, the Seventh Circuit said in Holmes :
 
 
 15
 We view the possibilities of furlough, transfer, and parole as cognizable benefits and agree with the Second Circuit that the "Special Offender classification works serious alteration in the inmate's conditions of confinement because it hinders or precludes eligibility for these important rehabilitative programs." Cardaropoli v. Norton, 523 F.2d at 995. We hold that such alteration created by the special offender classification constitutes a "grievous loss," Morrissey v. Brewer, 408 U.S. (471), at 481, 92 S.Ct. 2593 (33 L.Ed.2d 484); (U.S. ex rel.) Miller v. Twomey, 479 F.2d 701 (7th Cir. 1973), and, therefore, requires the basic elements of due process. (541 F.2d at 1251.)
 
 
 16
 The Government argues that the Supreme Court's recent decisions in Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and Montanye v. Haymes, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), have destroyed the theoretical underpinnings of Holmes and Cardaropoli. In Meachum and Montanye the Court concluded that the transfer of a prisoner from one prison to another within the same state, without a hearing, did not infringe the prisoner's liberty interest. The Court stated:
 
 
 17
 We reject at the outset the notion that any grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause. In Board of Regents v. Roth, 408 U.S. 564 (92 S.Ct. 2701, 33 L.Ed.2d 548) (1972), a university professor was deprived of his job, a loss which was surely a matter of great substance, but because the professor had no property interest in his position, due process procedures were not required in connection with his dismissal. We there held that the determining factor is the nature of the interest involved rather than its weight. Id., at 570-571 (92 S.Ct. 2701, 2705-2706). (Meachum v. Fano, supra, 427 U.S. at 224, 96 S.Ct. at 2538 (emphasis in original).)
 
 
 18
 While recognizing that some changes in condition of confinement could violate a prisoner's constitutional rights, the Court concluded that a transfer from one prison to another, though conditions at the second prison may be more harsh, does not violate the Constitution by adversely affecting the prisoner's liberty interest. In the present case the Government argues that the special offender designation and its attendant restrictions represent mere changes in conditions of confinement that are not sufficiently serious to amount to deprivation of a liberty interest in the constitutional sense.
 
 
 19
 We do not agree. We hold, following Cardaropoli and Holmes, that the special offender designation in the present case infringes the prisoner's right to liberty. In determining whether this right has been infringed:
 
 
 20
 The question is not merely the "weight" of the individual's interest, but whether the nature of the interest is one within the contemplation of the "liberty or property" language of the Fourteenth Amendment. (Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).)
 
 
 21
 Imprisonment, by its nature, limits the inmate's freedom, but it does not strip the inmate of all liberty or constitutional protections. Wolff v. McDonnell, 418 U.S. 539, 555-56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Prisoners enjoy religious freedom and retain their right of access to the courts. Id. at 556. Prisoners also retain the "freedom" to participate in parole, furlough, work release and community based rehabilitative programs provided by the Bureau of Prisons as an integral part of the rehabilitative process. See, e. g., Morrissey v. Brewer, supra, 408 U.S. at 477, 92 S.Ct. 2593. This liberty interest deserves due process protections, for, as the district court stated:
 
 
 22
 The designation of "special offender" deprives the inmate of even that limited liberty, for a prisoner whose file is so marked has practically no chance to obtain furloughs, even from minimum custody, is denied access to those community-based rehabilitation programs which are designed to reach one of the major objectives of incarceration responsible reentry into society and can never remove that label by his own conduct while in prison. This is not to say that no prisoner should be so labeled. The Court finds only that the consequences of such designation are sufficiently "grievous" to warrant some form of procedural due process prior to its attachment. (footnote omitted.)
 
 
 23
 The unique constraints imposed on "special offenders" distinguish this classification system from inter-prison transfers that are, in the words of the Supreme Court in Meachum, "within the normal limits or range of custody which the conviction has authorized the State to impose." 427 U.S. at 225, 96 S.Ct. at 2538.
 
 
 24
 Moreover, the special offender classification presupposes the existence of certain facts. The Supreme Court has considered several cases in which offenders participating in parole, probation, or other programs forfeited their right to participate in the programs because of subsequent misconduct. To protect the offenders from arbitrary action by officials, the Court has ruled that a hearing is necessary to determine the accuracy of the facts upon which the administrative decision was based. In Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the Court required a factfinding hearing prior to revocation of parole. In Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), the Court required a similar hearing prior to revocation of probation. The Court has also required a factfinding hearing before a prisoner is deprived of "good-time credits" as a disciplinary measure. Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Similarly, to allow prison officials to impose the burdensome special offender classification without first ascertaining the accuracy of the facts on which the classification is based would open the door to arbitrary action.[4]
 
 
 25
 The transfers involved in Montanye and Meachum required no factual determinations. In Meachum, the Court stated:
 
 
 26
 Insofar as we are advised, transfers between Massachusetts prisons are not conditioned upon the occurrence of specified events. On the contrary, transfer is a wide variety of circumstances is vested in prison officials. The predicate for invoking the protection of the Fourteenth Amendment as construed and applied in Wolff v. McDonnell is totally nonexistent in this case. (427 U.S. at 226-27, 96 S.Ct. at 2539 (footnote omitted).)
 
 
 27
 In Montanye, the Court stated: "But under the New York law, the transfer of inmates is not conditional upon or limited to the occurrence of misconduct." 427 U.S. at 243, 96 S.Ct. at 2547.
 
 
 28
 We conclude that because of their classification as special offenders, Polizzi and Zerilli suffer burdens uncommon to the general prison population. Their liberty interests are therefore invaded, requiring some form of procedural protections. In our view, Meachum and Montanye do not, as argued by the Government, overrule Holmes and Cardaropoli by implication.
 
 
 29
 IV. What Process is Due?
 
 
 30
 As the district court properly observed, the procedural protections appropriate in a prison setting are limited in scope and must be balanced against the interests of the penal system and the public. The district court's ruling on due process followed the Second Circuit's opinion in Cardaropoli, but that opinion had been issued before the Bureau of Prisons modified its procedure.
 
 The Government's brief notes that:
 
 31
 Since the adoption of the "central monitoring" policy statement, two courts which had previously imposed hearing requirements similar to what was ordered by the court below have held that the Bureau's own new policy gives adequate procedural protection to prisoners. Hartzell v. Wilkinson, Civil No. B-75-84 (D.Conn., Nov. 3, 1976) * * *, and Addonizio v. Arnold, 423 F.Supp. 189, 192 (M.D.Pa.1976). In addition the Court of Appeals for the Third Circuit has vacated a decision requiring the more formal classification procedures and ordered instead that the procedures of the Bureau of Prisons' new policy statement be applied. Raia v. Arnold, No. 75-2131 (3d Cir., July 8, 1976) * * *, vacating 405 F.Supp. 766 (M.D.Pa.1975).
 
 
 32
 Neither Polizzi nor Zerilli has availed himself of the opportunity to present evidence relating to his status as a "special offender" or a "central monitoring case." As we have already noted, the most recent Bureau of Prisons policy statement requires notice to the inmate of his status, a statement of reasons for that classification as a central monitoring case, and an opportunity to present evidence, oral or written, in opposition to that classification. All materials are then forwarded for decision-making to the central office and that decision is subject to administrative appeal.
 
 
 33
 This new policy provides some protection against arbitrary or mistaken action. The Bureau of Prisons procedures appear to be substantially similar to the procedures provided for in the district court's order, with the exception of the district court's provision for a right to counsel in some circumstances. We think the Bureau of Prisons should be given an opportunity to implement its policy. It would be premature on the state of the existing record to rule that more process is due than what is or will be available to prisoners under the present policy statement. Because Polizzi and Zerilli have not availed themselves of the existing procedures, they have not shown that resort to those procedures would likely produce any unfair result in each of their cases.
 
 
 34
 Accordingly, we affirm the judgment of the district court but direct that it be modified to provide that the procedural protections ordered be those set forth in policy statement No. 7900.53, without prejudice, however, to any post-hearing claim by appellees that the procedures specified in that policy statement may have been inadequate to protect their constitutional rights to procedural due process.
 
 
 
 [1]
 Polizzi and Zerilli were convicted as codefendants of violations of and conspiracy to violate 18 U.S.C. § 1952 (1970), prohibiting interstate travel and transportation in aid of racketeering enterprises. Following affirmance of their convictions, United States v. Polizzi, 500 F.2d 856 (9th Cir. 1974), they began their four-year sentences at the Federal Correctional Institute, Sandstone, Minnesota, on April 14, 1975
 
 
 [2]
 The Honorable Earl R. Larson, United States District Judge for the District of Minnesota
 
 
 [3]
 Policy Statement No. 7900.53 provides the following procedures:
 Each offender designated as a Central Monitoring Case must be notified of the designation and the reason or reasons for it and given an opportunity to present additional information to be considered. In cases where the Central Monitoring Case designation is made by the Central Office at the time an institution is designated for service of sentence, notice is to be given to the offender within 10 days of his arrival at that institution. In cases where a Central Monitoring Case designation is recommended by the institution and is to be referred to the Central Office for confirmation, notice is to be given to the offender and he or she is to be given an opportunity to respond before the referral to the Central Office is made. The procedures are as follows:
 (1) The inmate is advised in writing that he or she is to be so designated and advised of the reason(s). In advising of the reasons, however, care must be taken so as to not compromise security or safety.
 (2) The inmate is given the opportunity to respond and object to the designation if he or she desires to do so. His or her response may be made orally to the person designated by the Chief Executive Officer to supervise this program, and he or she may also submit written information. If the inmate indicates that the information must be obtained from outside the institution, he or she may be given a reasonable time (ordinarily not to exceed 30 days) to provide it.
 (3) The institution forwards to the Central Office complete information justifying the Central Monitoring Case designation, including a summary of the inmate's objections and a copy of all written material submitted by the inmate, under (2) above.
 (4) The Central Office notifies the institution and the inmate of the decision. The inmate is also advised that he or she may appeal the decision directly to the General Counsel in the Central Office through the Administrative Remedy procedures, without first appealing through the institutional and regional levels.
 
 
 [4]
 Marchesani v. McCune, 531 F.2d 459 (10th Cir.), cert. denied, 429 U.S. 846, 97 S.Ct. 127, 50 L.Ed.2d 117 (1976), cited by appellants, is not to the contrary, although the court in that case refused to require a hearing on the prisoner's "special offender" classification. The prisoner's classification was based on the nature of his conviction conspiracy to extort by threats of bodily harm. The prisoner did not dispute that fact. With no undisputed facts, a factual hearing would have served no purpose. The district court in Marchesani expressly distinguished cases, such as the present one, in which "the classification * * * rested upon unsupported allegations in presentence reports of 'possible connections to organized crime'." Id. at 460