665 F.2d 812
 Marvin N. ALBERS, Appellee,
v.
George A. RALSTON, Jr., Warden, United States Medical Center
for Federal Prisoners, Appellant.
Joseph L. BURNETT, Appellee,
v.
George A. RALSTON, Jr., Warden, United States Medical Center
for Federal Prisoners, Appellant.
William John POLITTE, Appellee,
v.
George A. RALSTON, Jr., Warden, United States Medical Center
for Federal Prisoners, Appellant.
 Nos. 81-1296 to 81-1298.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 14, 1981.
Decided Dec. 3, 1981.
 
 William Burlington, argued, Atty. Advisor, U. S. Medical Center for Federal Prisoners, Springfield, Mo., U. S. Bureau of Prisons.
 Ray Conrad, Federal Public Defender, W. D. Mo., R. Steven Brown, argued, Asst. Federal Public Defender, Springfield, Mo., for appellee Albers.
 J. Whitfield Moody, U. S. Atty., Frederick O. Griffin, argued, Robert G. Ulrich, Asst. U. S. Attys., Springfield, Mo., for appellant.
 William J. Politte, pro se.
 Donald R. Cooley, Springfield, Mo., for appellee Burnett.
 Before BRIGHT, HENLEY, and ARNOLD, Circuit Judges.
 BRIGHT, Circuit Judge.
 
 
 1
 Three prisoners, Marvin N. Albers, Joseph L. Burnett, and William John Politte, in separate habeas corpus petitions, complain that George A. Ralston, Warden of the United States Medical Center for Federal Prisoners, Springfield, Missouri, (Warden), adversely affected their conditions of confinement by refusing to follow the Bureau of Prisons regulations in classifying them. Specifically, the prisoners contend they did not receive on the security scoring portion of their custody classification forms a six-point credit for voluntary surrender to federal authorities. As a result, they argue that their conditions of confinement are more restrictive than called for by the regulations. The district court ordered the Warden to grant them the six-point credit.
 
 
 2
 On appeal, the Warden contends that the district court inappropriately awarded habeas corpus relief, inasmuch as the order directing him to give the prisoners the six-point credit infringes upon the Bureau of Prisons' broad discretion in the administration of prison affairs. Under the circumstances of this case, we agree with the Warden and, accordingly, reverse.I. Background.
 
 
 3
 The Bureau of Prisons assigns each prisoner a security and a custody classification.[1] The security designation affects the prisoner's assignment to a particular institution or to a particular portion of a multi-security level institution. The prisoner's custody classification determines his freedom within the institution.
 
 
 4
 To account for the lower security risk, the regulations in effect at the time of these prisoner classifications provided a six-point credit for prisoners who voluntarily surrendered to begin their terms of incarceration. For the security form, the regulation authorized a six-point credit "to an individual who is not escorted by a law enforcement official to the Marshal's office or to (the) place of confinement and who is not under bond or financial obligation to insure commitment." U. S. Dep't of Justice, Federal Prison System Program Statement No. 5100.1, § 9, at p. 10 (February 14, 1979) (emphasis added). The regulation for the custody classification form, however, did not mention freedom from bond or financial obligation, but simply authorized a six-point credit for voluntary surrender "to an individual who is not escorted by a law enforcement official to the Marshal's office or to (the) place of confinement." Id. § 11, at p. 9.
 
 
 5
 Each of the prisoners in this case surrendered voluntarily but did not receive the six-point credit on the custody classification form. Even though the Bureau of Prisons directive on custody classification did not expressly require freedom from bond or financial obligation,[2] the Bureau refused the six-point credit because each prisoner was subject to bond or financial obligation to insure his commitment at the time of his surrender. Objecting to that ruling, each prisoner brought a petition for a writ of habeas corpus against the Warden.
 
 
 6
 II. Proceedings in the District Court.
 
 
 7
 Upon receipt of the habeas corpus petition, the district court referred these cases to the United States Magistrate for review. The magistrate issued an order directing the Warden to show cause why the petitions for habeas corpus should not be granted. The Warden filed affidavits indicating that each petitioner had appeared subject to financial obligation and based denial of the six-point credit on the Bureau of Prisons' July 14, 1980 clarification which disqualifies from "voluntary surrender" individuals under bond or financial obligation. In response to a later show cause order, the Warden stated by affidavit that each prisoner was classified prior to the July 14, 1980 clarification.
 
 
 8
 The United States Magistrate concluded that petitioners were entitled to the six-point credit because the custody classification definition of "voluntary surrender" did not expressly mention financial obligation and because the Warden failed to justify the application of a definition effective July 14, 1980, to classifications made in 1979. In support of his recommendation, the magistrate cited Burton v. Ciccone, 484 F.2d 1322, 1324 (8th Cir. 1973), stating that "when a regulation or Program Statement is adopted (by the Bureau of Prisons) it must be followed."
 
 
 9
 The Warden filed exceptions to the magistrate's recommendations, asserting that the Bureau of Prisons had consistently interpreted its policy to authorize the six-point credit only if the individual who surrendered was not under bond or other financial obligation. The district court consolidated the petitions and overruled respondent's exceptions, noting that the regulation in question said nothing regarding financial obligation or bond, and stating that the Bureau must follow its own rules and regulations. Accordingly, the court granted the petitions for writs of habeas corpus and directed the Warden to award petitioners six points on the security portion of the custody classification form. This appeal followed.
 
 
 10
 III. Discussion.
 
 
 11
 On appeal, the Warden concedes that the Bureau of Prisons regulation by its terms does not state that only individuals free of bond or other financial obligation qualify for the six-point credit. The Warden asserts, however, that failure to incorporate this requirement into the regulation resulted from an oversight that the July 14, 1980 Bureau of Prisons clarification rectified. The Warden further asserts that even prior to this clarification, the Bureau of Prisons had consistently awarded the six-point credit only to individuals free of financial obligation. In addition, the Warden argues that habeas corpus relief is inappropriate because petitioners have no constitutional interest in the classification system sufficient to invoke due process protection.
 
 
 12
 The prisoners maintain their entitlement to the six-point credit for voluntary surrender because the definition of that term for the custody classification form does not require freedom from financial obligation. They do not contend that the Bureau of Prisons' refusal to award them the six-point credit rises to the level of a constitutional violation, but assert that the Bureau of Prisons must follow its own regulations.
 
 
 13
 In substance, we read the prisoners' complaint as an attack on the conditions of their confinement. The prisoners do not assert that awarding them the six-point credit would entitle them to earlier release. Rather, they claim that the six-point credit would entitle them to less restrictive conditions of confinement. Federal prisoners, however, may not resort to habeas corpus petitions to challenge every condition of confinement. This court has previously determined that federal prisoners may seek writs of habeas corpus to challenge their conditions of confinement only if they allege "a substantial infringement of a constitutional right(.)" Willis v. Ciccone, 506 F.2d 1011, 1019 (8th Cir. 1974).
 
 
 14
 Relying on Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), the Warden contends that the prisoners have no constitutional entitlement to the six-point credit. In Meachum, the Supreme Court held that state prisoners had no right to a hearing before a transfer from one state prison to another, because the discretionary transfer system did not implicate a liberty interest. Id. at 226-27, 96 S.Ct. at 2539. Subsequently, the Supreme Court observed that a similar decision by federal prison officials did not involve constitutional concerns. In Moody v. Daggett, 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976), the Court stated:
 
 
 15
 In Meachum v. Fano, 427 U.S. 215 (96 S.Ct. 2532, 49 L.Ed.2d 451) (1976), for example, no due process protections were required upon the discretionary transfer of state prisoners to a substantially less agreeable prison, even where that transfer visited a "grievous loss" upon the inmate. The same is true of prisoner classification and eligibility for rehabilitative programs in the federal system. Congress has given federal prison officials full discretion to control these conditions of confinement, 18 U.S.C. § 4081, and petitioner has no legitimate statutory or constitutional entitlement sufficient to invoke due process. (Id. at 88 n.9, 97 S.Ct. at 279 n.9.)
 
 
 16
 The Court's decisions in Meachum and Moody, however, did not address situations in which a statute, rule, or regulation had created constitutionally cognizable liberty interests. See Vitek v. Jones, 445 U.S. 480, 489-90, 100 S.Ct. 1254, 1261-62, 63 L.Ed.2d 552 (1980) (state statute created liberty interest precluding arbitrary transfer of prisoners to mental institutions); Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex, 442 U.S. 1, 12, 99 S.Ct. 2100, 2106, 60 L.Ed.2d 668 (1979) (state statute created legitimate expectation of parole warranting due process protection); Wolff v. McDonnell, 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974) (state statute created right to good-time credits). Other courts have recognized that the Bureau of Prisons may create constitutionally cognizable liberty interests through its rules and regulations. See Bills v. Henderson, 631 F.2d 1287, 1291-94 (6th Cir. 1980) (state department of corrections policy guidelines created legitimate expectation of freedom from administrative segregation absent certain findings); Walker v. Hughes, 558 F.2d 1247, 1255-56 (6th Cir. 1977) (Bureau of Prisons policy statements created liberty interest in not having sanctions imposed without finding of major misconduct).
 
 
 17
 To find a constitutional violation in the Warden's refusal to award the prisoners the six-point credit, we must first determine whether the Bureau of Prisons regulations created a liberty interest that the Warden arbitrarily withheld. The Bureau of Prisons regulations governing credits for voluntary surrender differ from the security and custody forms, but both regulations relate to aspects of prison security. These regulations, which relate ultimately to the same subject, conflict and, therefore, must be deemed ambiguous.
 
 
 18
 The prisoners do not assert that the Bureau of Prisons applied the regulations inconsistently or singled out any prisoner for unequal treatment. In fact, the evidence in this case is to the contrary. The Bureau of Prisons maintains that it has applied the credits for voluntary surrender consistently to all prisoners,[3] and has issued a statement clarifying the ambiguity. In these circumstances, we defer to the consistent interpretation of these ambiguous regulations by the Bureau of Prisons. In the absence of a showing of discriminatory application of the questioned regulations, and inasmuch as the prisoners do not assert that the Bureau of Prisons violated their constitutional rights,[4] the district court inappropriately granted the writ of habeas corpus ordering the Warden to award the prisoners the six-point credit.
 
 
 19
 We understand that the Warden will now follow the new regulations and grant the three-point credit to the appellees for surrendering while subject to bond or financial obligation.[5]
 
 
 20
 Before concluding, we make the following observations concerning the voluntary surrender program and the Bureau of Prisons credit for voluntary surrender. This court recognizes that the voluntary surrender program enjoys wide success. The program has resulted in significant savings to the government in manpower and money. In addition, the program provides a more humane means for convicted persons and their families to deal with incarceration.[6]
 
 
 21
 Notwithstanding our reversal in this case, this court considers flawed the Bureau of Prisons' distinction between prisoners who voluntarily surrender while under bond and those who appear without financial obligation. Such distinction often may not represent any real difference in security risk. Bond prescribed early in the criminal justice process and continued after conviction may be insignificant for security purposes. The critical decision affecting the security classification is the ruling of the sentencing judge, who with knowledge of all the circumstances authorizes the convicted defendant to surrender voluntarily either to a United States Marshal or to the prison. Moreover, surrender at a prison distant from the place of conviction should perhaps weigh more heavily in favor of a reduced security classification than voluntary surrender to a United States Marshal near the prisoner's home.
 
 
 22
 In view of the apparent inadequacies of the existing policies, we suggest that the Bureau of Prisons could greatly enhance the voluntary surrender program by reconsidering and appropriately modifying its current policies.[7]
 
 
 23
 ARNOLD, Circuit Judge, dissenting.
 
 
 24
 I respectfully dissent. The Court holds that habeas corpus relief is inappropriate because the petitioners do not allege a constitutional violation and "have no constitutional interest in the classification system sufficient to invoke due process protection." Ante, at p. 815. Reading the petitioners' complaint as an attack on their conditions of confinement, the Court relies on Willis v. Ciccone, 506 F.2d 1011, 1019 (8th Cir. 1974), for the proposition that a prisoner petition which seeks habeas corpus relief from prison conditions must allege "a substantial infringement of a constitutional right." I am unable to square this language with a Supreme Court case decided the same year as Willis in which the Court held that a claim grounded in other than constitutional law is cognizable in a proceeding under 28 U.S.C. § 2255. See Davis v. United States, 417 U.S. 333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974).[1]
 
 
 25
 In Davis the Supreme Court stated that "the fact that a contention is grounded not in the Constitution, but in the 'laws of the United States' would not preclude its assertion in a § 2255 proceeding." 417 U.S. at 346, 94 S.Ct. at 2305. The statute expressly allows a federal prisoner in custody to assert a claim that his confinement is "in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255 (emphasis added).
 
 
 26
 Recent circuit and district court cases echo the reasoning of the Supreme Court in Davis. In United States v. Williams, 615 F.2d 585, 589 (3d Cir. 1980), the court held that:
 
 
 27
 Section 2255 provides that a prisoner may seek collateral relief if he claims "the right to be released upon the ground that the sentence was imposed in violation of the Constitution, or laws of the United States, ...." (Emphasis supplied.) Collateral relief, therefore, may be based on a purely statutory ground. On its face, a claim that IADA (Interstate Agreement on Detainers Act) was violated by the Government would appear to come within the purview of section 2255 inasmuch as the IADA is a law of the United States and its violation is an absolute defense. Indeed, we have held that an alleged violation of IADA is a claim arising under the laws of the United States for purposes of a federal habeas corpus proceeding brought by a state prisoner. United States ex rel. Esola v. Groomes, 520 F.2d 830, 835 (3d Cir. 1975). We see no difference in the statutory language of section 2255 which would merit a different result than that reached in Esola and we therefore conclude that an IADA defense is within the scope of the language in section 2255.
 
 
 28
 (Emphasis added). See also Young v. Mabry, 471 F.Supp. 553 (E.D.Ark.1978); but see Hitchcock v. United States, 580 F.2d 964 (9th Cir. 1978), and Edwards v. United States, 564 F.2d 652 (2d Cir. 1977) (a claim based on a violation of IADA is not within § 2255).
 
 
 29
 There is no reason to suppose that the rationale of Davis would be inapplicable to a habeas proceeding under 28 U.S.C. §§ 2241 or 2254. Indeed, the Supreme Court in Davis noted, in reference to § 2255, that "(a)s a remedy it is intended to be as broad as habeas corpus." 417 U.S. at 344, 94 S.Ct. at 2304. The converse of that statement is at least as true. The basic scope of habeas corpus is prescribed by 28 U.S.C. § 2241(c), which provides that the "writ of habeas corpus shall not extend to a prisoner unless ... (h)e is in custody in violation of the Constitution or laws or treaties of the United States" (emphasis added). I have no difficulty with the proposition that a regulation of the Bureau of Prisons, issued pursuant to statutory authority, is a "law" of the United States for this purpose.
 
 
 30
 In the alternative, if habeas corpus is not the appropriate form of action, the court has the power to fashion its own remedy if justice so requires. As stated by the Supreme Court in United States v. Morgan, 346 U.S. 502, 505, 74 S.Ct. 247, 249, 98 L.Ed. 248 (1954), "(i)n behalf of the unfortunates, federal courts should act in doing justice if the record makes plain a right to relief." In Hestad v. United States, 418 F.2d 1063, 1066 n.5 (7th Cir. 1969), the court noted that "(a) court of appeals is empowered to grant habeas relief in exceptional circumstances .... It follows a fortiori that in exceptional cases we can consider the merits of an appeal from relief granted pursuant to § 2255 regardless of whether that section was the appropriate procedural form by which to grant relief." Further, on this point, the following statement should be considered:
 
 
 31
 On an initial motion seeking a collateral remedy ..., a district judge is not obliged to limit his examination to the grounds narrowly alleged, but is free to, and I believe is required to, adopt any appropriate means to ascertain all possible grounds on which the petitioner might claim relief.
 
 
 32
 Rothman v. United States, 508 F.2d 648, 655 (3d Cir. 1975) (Garth, J., concurring).
 
 
 33
 Finally, the court in Ramer v. Saxbe, 522 F.2d 695 (D.C.Cir.1975), was confronted with a complaint filed by several federal prisoners alleging that the Bureau of Prisons had violated Sections 3 and 4 of the Administrative Procedure Act, 5 U.S.C. §§ 552 and 553, by failing to publish in the Federal Register notices of rulemaking and the texts of numerous rules and regulations. The plaintiffs contended that the district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, 1361, 2201, and 2202. They sought declaratory, injunctive, and mandamus relief. The district court dismissed the action for lack of jurisdiction, finding that the plaintiffs had not alleged an actual case or controversy. The court of appeals reversed, noting that the plaintiffs need not have raised a constitutional claim "in order to get the ear of the court." 552 F.2d at 702.
 
 
 34
 In the present case, there is no reason why the prisoners' habeas corpus petition cannot be construed as a claim for mandamus relief pursuant to 28 U.S.C. § 1361, or simply as a suit in equity arising under federal law, of which we have jurisdiction under 28 U.S.C. § 1331. The petitioners are seeking to compel the Bureau of Prisons to award them a six-point credit in their custody classifications because of their voluntary surrender. I cannot bring myself to describe respondents' July 14, 1980, Change Notice as a mere "clarification." The phrase "and who is not under bond or financial obligation to insure commitment," which appears on p. 10 of the Federal Prison System Program Statement, dealing with security classification, is conspicuous by its absence from p. 9, dealing with custody classification. Perhaps the Bureau of Prisons did not mean to omit the phrase on p. 9. Perhaps it acted correctly in changing its rules in 1980. But to characterize the change as only a clarification does violence to the English language.
 
 
 35
 Petitioners are in jail. No doubt they deserve to be. They broke the law and are taking the consequences. In my view, respondents have also broken the law, in the sense of having failed to live up to their own voluntarily issued regulations. It is no answer to say that respondents have discretion to make decisions about custody and security. Of course they do. My position is simply that respondents have limited their own discretion by issuing a Program Statement, and that they should have to keep their word. We have long required that the Bureau of Prisons "substantially comply with its own rules and regulations." Burton v. Ciccone, 484 F.2d 1322, 1324 (8th Cir. 1973).[2] I would affirm the District Court.
 
 
 
 [1]
 The security designation describes the security level of the institution in which the prisoner is placed, ranging from I to VI (least secure to most secure). The custody classification ("community," "in," "out," or "maximum") refers to the degree of staff supervision that the prisoner requires in his institutional activities
 
 
 [2]
 On July 14, 1980, subsequent to the classification of these prisoners, the Bureau of Prisons issued a Change Notice incorporating certain clarifications that had been issued via an Operations Memorandum. One particular clarification added the phrase "and who is not under bond or financial obligation to insure commitment" to the definition of voluntary surrender in the custody classification section
 
 
 [3]
 The prisoners point to two cases in which the United States District Court for the Western District of Missouri ordered the Warden to grant prisoners the six-point credit. See Colyer v. Ralston, No. 80-3100-CV-S-WRC (W.D.Mo. May 16, 1980); Martin v. Ralston, No. 79-3212-CV-S-WRC-R (W.D.Mo. October 11, 1979). The prisoners, however, point to no instances in which the Bureau of Prisons voluntarily awarded the six-point credit to individuals who voluntarily surrendered while under bond or financial obligation to appear
 
 
 [4]
 Even if we construed the Bureau of Prisons regulations as creating a liberty interest in the six-point credit for voluntary surrender, the regulations themselves indicate that the Bureau of Prisons has discretion to consider other factors in assigning the individual prisoner to a particular institution or security level. See U. S. Dep't of Justice, Federal Prison System Program Statement No. 5100.1, § 2, at p. 1 (February 14, 1979). Because the Bureau of Prisons retains considerable discretion within the existing guidelines to assign prisoners, we doubt that the prisoners' interest in the six-point credit alone is of constitutional magnitude. Cf. Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976)
 
 
 [5]
 Recently the Bureau of Prisons promulgated an additional Change Notice which provides a three-point credit to a person who voluntarily surrenders while under financial obligation. The Bureau of Prisons will give three additional points to all inmates presently under its control, including the appellees
 The Warden argues that this court's decision in Polizzi v. Sigler, 564 F.2d 792 (8th Cir. 1977), governs this dispute over the six-point credit. In Polizzi we allowed the Bureau of Prisons to implement a change in its policy regarding the classification of special offenders. The prisoners maintain that Polizzi does not control this case, because the regulation change in Polizzi worked to the prisoners' advantage, whereas the change here disadvantages the prisoners. Because we have decided that the Bureau of Prisons' consistent interpretation and application of these ambiguous regulations was proper in this case, we do not reach the Polizzi issue on the regulation change.
 
 
 [6]
 Former Deputy Attorney General, Charles B. Renfrew, a former United States District Judge, in a letter dated April 28, 1980, to the Director of the Administrative Office of the United States Courts discussing the voluntary surrender program, observed:
 Since I became Deputy Attorney General, I have been exposed to many aspects of the criminal justice process from a very different perspective than my former vantage point as a Federal district court judge. Two matters in particular involving the United States Marshals Service and the Bureau of Prisons have come to my attention about which I am seeking your help and the help of my former colleagues on the Federal bench.
 The first involves the voluntary surrender of persons committed to Federal custody. Over 20 percent of all commitments from the Federal courts now voluntarily place themselves in the custody of the U. S. Marshal or report to the institution where they are designated to serve their sentences. The cost savings to the government are significant; a study by the Bureau of Prisons of all voluntary surrenders for the three months of July, August, and September, 1979, found that the cost savings to the Federal government amounted to over $500,000 during that short period. In addition to savings in the costs of transportation and temporary imprisonment, voluntary surrender in most instances is also preferable to the inmate and to the inmate's family.
 The Bureau of Prisons study found that voluntary surrender was used most commonly for the lowest custody levels of offenders, but that even in those categories, less than 30 percent of all commitments to Federal correctional institutions were voluntary surrenders. Voluntary surrender was also used successfully in several instances for offenders classified at medium custody levels. Courts in the Western and Northeast regions of the country used voluntary surrender less frequently than courts in other regions.
 I would like to urge all Federal judges to give serious consideration to the possibility of ordering voluntary surrender when persons are committed to serve time in Federal custody. I would expect that voluntary surrender might be found appropriate for a majority of offenders at low custody levels, and may also be possible for many offenders at higher custody levels. From the standpoints both of costs to the Federal government and the sensibilities of inmates and their families, voluntary surrender ought to be preferred whenever it is consistent with the public safety and the orderly administration of justice.
 
 
 [7]
 While we do not disagree with the thrust of the dissent that a violation of law may serve as a basis for habeas relief, we observe that the cases cited therein refer to the fact of confinement, Davis v. United States, 417 U.S. 333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974); United States v. Williams, 615 F.2d 585 (3d Cir. 1980), or its duration, Burton v. Ciccone, 484 F.2d 1322 (8th Cir. 1973)
 
 
 [1]
 Furthermore, I doubt that Willis really means what the Court today reads it to mean. The phrase, "substantial infringement of a constitutional right," 506 F.2d at 1019, on which the Court lays such stress, cannot fairly be taken to mean that federal habeas does not lie to test whether confinement violates federal law, as opposed to the federal Constitution. The question in Willis revolved around substantial constitutional claims as opposed to insubstantial ones. Compare the formulation at 506 F.2d at 1015; "habeas corpus is limited to claims involving the deprivation of substantial rights ...." (footnote omitted)
 
 
 [2]
 Burton itself was a habeas case brought by a federal prisoner. This Court's opinion says nothing about the Constitution. It merely orders the Parole Board to "comply with its own rules and regulations." Willis does not question Burton, and no one suggests that the instant case should fall outside the rule of Burton because the regulations at issue here are those of the Bureau of Prisons rather than the Parole Board
 Footnote 7 of the Court's opinion, ante, at 817, suggests that habeas is properly held unavailable here because petitioners' complaint concerns conditions of confinement, rather than the fact of confinement or its duration. It is still hard for me to understand why the prayer for relief cannot be treated as one for mandamus or injunction.